BAIRD & WARNER, INC., Plaintiff-Appellant, *v.* ARNOLD RUUD *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 62692

Opinion filed December 7, 1976.—Rehearing denied February 14, 1977.

Sidley & Austin, of Chicago (Henry A. Preston, George W. McBurney, and Dale R. Crider, of counsel), for appellant.

John J. Voortman and Roger Pascal, both of Schiff, Hardin & Waite, of Chicago, for appellee Addison Industrial Park, Inc.

David L. Jorgenson, of Lisle, for appellee Arnold Ruud.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

This is an action for a real estate commission allegedly due under an exclusive real estate brokerage contract dated January 23, 1968. The action is brought by plaintiff, Baird & Warner, Inc., a real estate broker, against the defendants, Addison Industrial Park, Inc., and Arnold Ruud and his wife.

The matter first came before the trial court on plaintiff's motion for summary judgment. The motion judge entered summary judgment in favor of plaintiff as to liability on two counts of the complaint. But the judge to whom the matter was then assigned for trial on the issue of damages only, vacated the summary judgment order and submitted the entire case to the jury. The jury verdict was for the defendants. Judgment was entered on the verdict and plaintiff takes this appeal.

In May 1966, Stewart D. Matthews, senior vice president of Baird & Warner, first met with Arnold Ruud, managing officer of Addison Industrial Park, for the purpose of engaging Baird & Warner to act as broker for the sale of a 174-acre parcel of unimproved industrially zoned property located in Addison, Illinois. This property was the corporation's only asset. Arnold Ruud then owned 30% of the stock of the corporation; National Life Insurance Company owned 40%, and Lee N. Sutliffe owned the remaining 30%.

On June 1, 1966 (over a year and a half prior to the January 23, 1968, contract that gives rise to this action), Addison Industrial Park entered into an exclusive listing agreement covering the sale of the property at $11,000 per acre for a customary real estate commission. The contract was terminable at any time after six months and automatically terminated after two years. The property in this contract is described as the northwest corner of Fullerton and LaLonde Avenues, Addison, Illinois, comprising approximately 175 acres.

Also on June 1, 1966, the three shareholders of Addison Industrial Park entered into a contract with Baird & Warner which provided that Baird & Warner was to receive a commission of 5.25% of the stock sale price if it sold the stock of Addison Industrial Park, Inc., at a price of $890,000. This contract was to extend until December 1, 1966. A second agreement regarding the sale of the stock was subsequently entered into and was identical to the first in all respects except that Baird & Warner's commission was to be 11% of the stock sale price. Still later a third agreement was entered into which was identical with the second agreement except that it covered the nine-month period from December 1, 1966 to September 1, 1967. No further agreements regarding the sale of

the stock were ever entered into and when, in September 1967, the last agreement expired, Baird & Warner discontinued its efforts to market the stock. During the time the above agreements were in effect, Baird & Warner produced no offer to purchase the stock nor any offer to purchase the real estate.

On January 23, 1968, an exclusive agreement was executed between Baird & Warner and Addison Industrial Park (by their respective representatives, Matthews and Ruud) which provided that Baird & Warner was to be the exclusive agent for the sale of the real property and that Addison Industrial Park "shall pay the broker the brokerage commission specified above (10% of the gross selling price) if the property is sold by the broker, by the company or through any other person during the period of this agreement." The agreement was to remain in full force and effect until the entire property was sold or leased, but, after a period of 18 months from June 1, 1968, either party had the right to terminate the agreement by a 60-day notice in writing. The property referred to in the agreement is described as "real estate located at the northwest corner of Fullerton and LaLonde Avenues, Addison, Illinois, consisting of 66 lots." The agreement stated the broker desires to represent the company in the "sale of the 66 lots referred to* * *." Each of the 66 lots is listed in an addendum to the agreement by lot number, size, price per square foot, and total estimated selling price. Although the "property" is variously referred to as "property", "real estate" and "66 lots," it is clear that the parties referred only to the real estate and not to the stock in the agreement of January 23, 1968. This fact is undisputed. And, Baird & Warner does not contend that there was any commission due to it on the sale of the stock. The exclusive agreement was terminable by either party on December 1, 1969, after notice and was the only agreement in effect between the parties and any of the other parties to this lawsuit at anytime after January 23, 1968.

On August 7, 1969 (after negotiations between the parties which began in March of 1969), a contract was entered between Arnold Ruud and his wife (the Ruuds had acquired all of the stock from the other shareholders prior to this date) and Bliss & Laughlin Industries. That agreement provided for the exchange of all the stock of Addison Industrial Park for shares of stock in Bliss & Laughlin Industries. The agreement indicates that Addison Industrial Park was in title to the real estate at the time of the agreement and that the consummation of the agreement would not affect the state of title. The title of the property in Addison is reflected by a title insurance commitment dated July 8, 1969, wherein the titleholder and the proposed insured are both indicated as Addison Industrial Park, Inc. Baird & Warner had been informed at least as early as July 1, 1969, of the proposed stock exchange and, at Addison Industrial Park's request, Baird

& Warner had made an appraisal of the property in anticipation of the Bliss & Laughlin Industries' transaction. There was no claim made by Baird & Warner at that time that there was any commission due to Baird & Warner as a result of the transaction. Bliss & Laughlin Industries and the Ruuds were brought together by another broker for purposes of the stock transaction, and Baird & Warner never alleged or contended that it was the procuring cause of that transaction. Baird & Warner contends, however, that it is entitled to the commission under the provision of the contract which provides for a commission for Baird & Warner if the real property is sold by anyone during the period of the agreement.

Subsequent to the agreement between the Ruuds and Bliss & Laughlin Industries, Baird & Warner with the express concurrence of Bliss & Laughlin Industries, continued to treat the January 23, 1968, agreement as in effect and tendered to Addison Industrial Park an offer (at below contract price) to purchase certain lots. After Baird & Warner was fully informed that the exchange of stock had been consummated, Baird & Warner negotiated with Addison Industrial Park concerning renewal of the exclusive agreement. The exclusive agreement was then terminated by Addison Industrial Park pursuant to the terms of the contract as of December 1, 1969.

Plaintiff's primary contention is that the principle established in *Benedict v. Dakin* (1909), 243 Ill. 384, 90 N.E. 712, is applicable in the instant case. In *Benedict* the court held that "[t]he sale of all of the stock of the corporation is, in legal effect, a sale of all of its assets." (243 Ill. 384, 388.) The plaintiff argues that it is entitled to its commission under its brokerage contract with Addison Industrial Park for the sale of Addison's real property, since the Ruuds, owners of all of Addison's stock, exchanged all their stock (and consequently in effect the real estate) for Bliss & Laughlin Industries' stock, so that this transaction is the same as the transaction in *Benedict*. In *Benedict*, Dakin contracted with Benedict for Benedict "to find a purchaser for the property of the Natalbany Lumber Company and the New Orleans, Natalbany and Natchez Railroad Company" and Dakin told Benedict that "if he was successful he would be properly compensated." (243 Ill. 384, 386.) The capital stock of both corporations was owned by Dakin and two associates. Benedict obtained detailed information of the nature and character of the property to be sold. Dakin and his associates then sold the entire capital stock of the two corporations to a purchaser procured by Benedict. Dakin refused to pay Benedict any commission. Benedict sued and a judgment in his favor was entered by the trial court sitting without a jury.

On appeal the court said Dakin "contends that there should have been a finding for him because the contract of employment was to sell a saw mill, real estate and a railroad, while the evidence shows that what [Benedict]

really did was to find a purchaser who bought the stock of the two corporations which owned the tangible property which he was commissioned to sell. The distinction which [Dakin] seeks to make in this regard is too finely drawn to be of practical value. The sale of all of the stock of the corporation is, in legal effect, a sale of all of its assets. The mere fact that the parties found it more convenient to transfer all of the stock rather than to make conveyances of its assets does not change the substance of the transaction." 243 Ill. 384, 388.

Baird & Warner argues that, in accordance with the rule in the *Benedict* case, the sale by the Ruuds of all of the Addison Industrial Park stock to Bliss & Laughlin Industries was in legal effect the sale by Addison of its real property under the contract. The construction that Baird & Warner apparently would put on *Benedict* is that, in every instance, the sale of the stock is the sale of the real estate. We cannot agree.

■■ Implicit in *Benedict* is the finding that it was the intention of the parties that, if Benedict found a purchaser for the saw mill, railroad, and real estate, no matter what form the sale took, he was entitled to a commission. Our Supreme Court specifically noted that "there was no room for doubt" that under the evidence Benedict was employed to find a purchaser for the property and that Benedict was the procuring cause of the sale and further that Benedict was promised a compensation in case he succeeded in finding a purchaser. Hence, the principle established in *Benedict* is that, where the broker is exclusively commissioned for a term to procure a purchaser for corporate property and where the brokerage contract does not distinguish between the direct purchase of the property itself and the indirect purchase of the property through the purchase of all the shares of the corporate owner and where the broker then procures a purchaser for all of the said shares, the broker has earned his commission. Should an issue arise as to whether the parties did or did not intend to make the said distinction, then the silent brokerage contract would be ambiguous in that respect, so that extrinsic evidence would be admissible to resolve the issue. Even where the parties did intend *only* the direct purchase of the corporate realty itself (as evidenced either by the brokerage contract on its face or by the extrinsic evidence where the brokerage contract is silent) and the owner of all the shares of stock of the corporation then sells all the said shares with the intent thereby indirectly to transfer the corporate realty to the purchaser in avoidance of the obligations of the corporate brokerage contract, the indirect transfer of the corporate realty with the said intent might well be a breach of the corporate brokerage contract.

■■ In any event, there is nothing in *Benedict* that would suggest that we must abandon the rule that provides that the primary object of the

construction of a contract is to give legal effect to the intention of the parties. (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 N.E.2d 683.) The contract in the instant case leaves the true intent of the parties in doubt and is ambiguous. The contract refers to "property," "real estate" and "66 lots." The preliminary negotiations showed that the parties considered the sale of the corporate stock and the sale of the corporate real estate separately. On June 1, 1966, they entered into separate contracts for the sale of each. The court properly admitted evidence of the preliminary negotiations initially to determine if there was an ambiguity in the contract and then, if there was, to determine the proper resolution of that ambiguity. (4 Williston, Contracts §601, at 310-11 (3d ed. 1961); 3 Corbin, Contracts §579, at 421-22 (1960); *Lucie v. Kleen-Leen, Inc.* (7th Cir. 1974), 499 F.2d 220; *International Minerals & Chemical Corp. v. Husky Oil Co.* (7th Cir. 1973), 485 F.2d 153; *Ortman v. Stanray Corp.* (7th Cir. 1971), 437 F.2d 231.) When the language used in a contract is not clear or is ambiguous, extrinsic evidence may be used so long as the evidence does not change or vary the agreement. *Arrington v. Walter E. Heller International Corp.* (1975), 30 Ill. App. 3d 631, 333 N.E.2d 50; *Estate of McKay v. Moses* (1976), 35 Ill. App. 3d 458, 343 N.E.2d 45.

■■ The extrinsic evidence, in addition to the preliminary negotiation, shows that defendant Ruud gave notice to Baird & Warner that Addison Industrial Park had engaged in negotiations with Bliss & Laughlin Industries for the sale of the stock; that the plaintiff, at defendant's request, prepared a new appraisal of the property in anticipation of the stock exchange being negotiated; that the title of the property was vested in Addison Industrial Park, Inc., both before and subsequent to the exchange of the stock; that Baird & Warner's right to earn the commission had not been foreclosed or extinguished by the exchange of the stock; that plaintiff, at the urging of Bliss & Laughlin Industries, continued to act as broker for the sale of the lots after the stock exchange transaction; and that the plaintiff negotiated with Addison Industrial Park, after the stock exchange, for an extension of the exclusive agreement. Varying inferences may be drawn from the evidence presented as to whether the parties intended that the sale of the property meant the actual sale of the real estate and not the sale of the stock. The case was properly submitted to the jury to determine the inferences to be drawn therefrom.

■■ Plaintiff next argues that, since it seeks no commission on the sale of the stock but only on the sale of the Addison real property, the trial court, under a misapprehension of the *Benedict* principle, submitted the case to the jury on a different theory than the one advanced by plaintiff, thus denying plaintiff due process of law. We find this contention without merit. The trial court correctly disagreed with plaintiff's theory that in all

cases an exchange or sale of corporate stock is the legal equivalent of the sale of real property. We do not see that a different theory was submitted to the jury, only that the arguments for both sides were submitted.

Plaintiff states that the court was in error in reversing the ruling made by the motion judge which had been in favor of the plaintiff. A trial judge is not only empowered but bound to correct a wrong ruling of a motion judge and failure to do so is error. (*Banks v. United Insurance Co. of America* (1975), 28 Ill. App. 3d 60, 63, 328 N.E.2d 167.) The result of a motion improperly ruled on becomes merged in the trial. *Home Indemnity Co. v. Reynolds & Co.* (1962), 38 Ill. App. 2d 358, 187 N.E.2d 274.

■■ The defendant Ruud filed his answer to the complaint on February 3, 1975, by leave of court and asserted a defense of misrepresentation. The plaintiff argues that permitting the amendment on the eve of trial was error. Section 46 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 46) provides for liberal amendment of the pleadings "at any time before final judgment" upon "just and reasonable terms." The plaintiff did not claim surprise or ask for additional time to prepare to meet this defense. No problems with discovery were alleged. The issue had been raised in a prior answer to a different count of the complaint as early as December 1970. We find no prejudice to the plaintiff in allowing the amendment. (*Wiegel v. One LaSalle Co.* (1966), 75 Ill. App. 2d 272, 221 N.E.2d 117.) Whether or not the evidence admitted on the issue of misrepresentation was sufficient to support a finding for defendants was a question of fact properly submitted to the jury who could weigh the evidence and assess the credibility of the witnesses. *Kehl v. Abram* (1904), 210 Ill. 218, 71 N.E. 347.

In the same vein, plaintiff argues that the court's instruction as to the rule in *Benedict* was erroneous in that it substantially misstated the law, was unduly confusing, and required the jury to resolve questions of law which should have been determined by the trial judge.

The instruction (given as court instruction No. 1) to which plaintiff objects is as follows:

> "It is the law that if a broker enters into a contract with a corporation to sell all, or substantially all, of its assets and subsequently a transaction with a buyer takes the form of a purchase of all of the capital stock of the corporation instead of a direct sale of the assets, the broker may nevertheless be entitled to the commission provided in his contract. Under appropriate circumstances, the sale of the stock may, in effect, be the sale of the assets, and the mere fact that the parties found it more convenient or advantageous to transfer all of the stock rather than to make a

conveyance of the corporate assets does not change the substance of the transaction.

On the other hand, it is also the law that a corporation is an entity separate and distinct from its stockholders. A sole stockholder is not the owner of the corporate assets and a sale of the corporate stock owned by him is not necessarily the equivalent of a sale of the corporate assets under all circumstances.

Whether the sale of the stock is equivalent to a sale of the assets depends upon (a) what the broker and the corporation intended, that is, what was within their contemplation at the time when the brokerage contract was entered into, and (b) whether the sale of the stock to a third party resulted in any impairment of the rights and liabilities of the broker and the corporation to fulfill their respective obligations under the brokerage agreement.

These are questions of fact for you to decide."

■■ Plaintiff argues that the instruction "seriously misstated the law, and, considered as a whole, is grossly misleading and confusing." As we stated above, we agree with the trial court and do not believe that the principle stated in *Benedict* means that in all cases an exchange or sale of corporate stock is the legal equivalent of the sale of all or substantially all the corporate assets. Whether or not the parties intended the transactions to be equivalent and whether the broker's rights or duties were impaired by the transaction were relevant and material inquiries properly designated as questions of fact for the jury. Plaintiff does not argue that the statements that "a corporation is an entity separate and distinct from its stockholders" and a "sole stockholder is not the owner of the corporate assets" are objectionable or erroneous. He objects only to the language "not necessarily" and "under all circumstances," as contained in paragraph two of the instruction, arguing that it was confusing and misleading. We do not find it confusing, misleading or a misstatement of the law.

■■ The trial court did not err in refusing to permit an explanation of Mr. John Baird's admissions that Baird & Warner did not believe the exclusive agreement covered "a sale of the shares" and that Baird & Warner treated the exclusive agreement as "still in effect" after the exchange of stock. The offer of proof which Baird & Warner made was precluded by the trial court as hearsay. There is nothing in the record to suggest that any explanation would have negated or minimized the effect of the purported admissions.

■■ There was no error in the trial court's refusing plaintiff's instruction regarding the tax consequences to Ruud of the Bliss &

Laughlin Industries stock exchange since no evidence was adduced at trial regarding the payment or nonpayment of tax. It is not error for a court to refuse an instruction when there is no evidentiary basis for that instruction. *McKasson v. Zimmer Manufacturing Co.* (1973), 12 Ill. App. 3d 429, 299 N.E.2d 38.

While the defendants' instructions regarding the *alter ego* theory could have been more complete, we do not see that it misstated the law. Failure to give plaintiff's *alter ego* instruction did not prejudice plaintiff and was not error.

Since we find for the defendants on appeal we need not discuss the issues raised by plaintiff in the matter of damages.

Judgment affirmed.

HAYES and DOWNING, JJ., concur.