KEEP PRODUCTIONS, INC., Plaintiff-Appellant, *v.* ARLINGTON PARK TOWERS HOTEL CORPORATION, Defendant-Appellee.

First District (3rd Division)   No. 76-649

Opinion filed May 11, 1977.

Howard C. Emmerman, of Rudnick & Wolfe, of Chicago, for appellant.

Oscar O. D'Angelo, Martin M. Ruken, and Robert J. Rubin, all of Chicago (Friedman & Koven, of counsel), for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

This action was brought for a mandatory injunction to restore plaintiff Keep Productions, Inc., to possession of the premises commonly known as the Arlington Park Theatre, pursuant to the provisions of a license agreement entered into between plaintiff as licensee and defendant Arlington Park Towers Hotel Corporation as licensor and owner of the premises. On March 31, 1976, on plaintiff's motion and verified complaint and after notice and an evidentiary hearing, the trial judge, sitting without a jury entered a preliminary mandatory injunction restoring plaintiff to the use and occupancy of the premises. Thereafter defendant filed a petition to vacate the order of March 31 and on April 19, 1976, after three days of evidentiary hearings, the court entered an order vacating the preliminary injunction, *nunc pro tunc* April 15, 1976. It is from this order that plaintiff appeals, raising questions as to the admissibility and sufficiency of the evidence considered by the court and contending that it was error to apply the court's findings prospectively so as to terminate the remainder of the contract. Defendant filed a notice of interlocutory cross-appeal claiming that the court erred in not dissolving the injunction for want of equity on the ground that plaintiff had an adequate remedy at law.

Plaintiff, Keep Productions, Inc. ("Keep"), as licensee, and defendant, Arlington Park Towers Hotel Corporation ("APTHC"), entered into a license agreement on July 30, 1975, concerning the use of the Arlington Park Theatre, owned by defendant. The agreement was to expire on

September 20, 1976, or earlier in the event of default as described in the agreement. The license agreement provides in pertinent part: that in exchange for the right to use, occupy and possess certain portions of the theatre (and box office and adjacent parking lot), Keep would pay APTHC a license fee of $49,000, payable in monthly installments of $7,000 for seven months; that the theatre be used "only for the presentation of legitimate live theatrical productions, fashion shows, and, with prior written consent of the licensor, which consent shall not be unreasonably withheld, other entertainment events and no other use"; and Keep was to conduct such productions "on the average, six (6) performances per performance week" and that Keep would be permitted to be closed for "a cumulative maximum period of nine (9) weeks" during the term of the agreement, but not longer than "a consecutive period of 21 days, unless such closing is the result of casualty, acts of God or failure of a principal actor to appear for a scheduled performance."

Keep's first production at the theatre in August 1975 was a play starring Lana Turner and Louis Jordan, described by Keep's president David Lonn as "very famous superstars," which cost $33,000 per week to produce. Other plays presented featured show business personalities variously described by Lonn as "Academy Award winners," "well-known" actors, stars of the "first rank" or the "very first magnitude," and averaged about $20,000 per week in production costs. Adult ticket prices ranged from "around $4 to $15 per performance.

On or about March 4, 1976, defendant, taking the position that plaintiff had breached the license agreement by allowing the theatre to remain closed for a total number of days in excess of that allowed by the agreement, barred Keep from the premises by placing locks and chains on the doors. Defendant then served plaintiff with notice that the license agreement had been breached and terminated. On March 19, 1976, Keep filed a complaint praying for the issuance of a mandatory injunction restoring it to the theatre premises and enjoining APTHC from depriving Keep of possession, use and occupancy of the premises, and for damages. On March 26, APTHC filed its answer, generally denying plaintiff's allegations and stating that plaintiff had an adequate remedy at law. Three days later an evidentiary hearing was commenced. On March 31, 1976, the court made specific findings of fact and entered a preliminary injunction restoring Keep to the use and occupancy of the theatre. The court determined that in measuring down time, a "performance week" was a six day week excluding Mondays; that Keep was entitled to be closed for a "cumulative maximum period of nine (9) weeks" which meant 54 days; that Keep had been impermissibly closed for a total of 45 days, leaving nine down days remaining. Pursuant to the court order of March 31, 1976, APTHC restored Keep to use and occupancy of the

theatre, and the period of time for computing impermissible down time recommenced, having been tolled from March 4 through March 30.

Keep resumed use and occupancy of the theatre on March 31, 1976, but no performance was presented that day, nor on April 1, 2, 3 or 4, 1976. April 5 was a Monday. On April 6 and 7, performances by the Free Street Theatre was presented. The Free Street Theatre, characterized as an "alternative," "environmental" and "public" theatre by its founder, consists of a group of actors, singers, dancers and musicians and engages in various scripted and improvisational activities, including some audience participation. The production contract provided for an indefinite run of at least six performances per week, and further required Keep to give at least two weeks notice of cancellation.

There was no advance notice nor advance ticket sales for the performances of April 6 and 7. No admission was charged for these presentations, but donations were solicited by the performers from the audience. These donations were solely for the benefit of the Free Street Theatre. On April 8, 1976, a bomb exploded at the theatre, damaging it to the extent that it could not be occupied safely. Thereafter, on April 12, APTHC filed a petition to vacate the preliminary injunction, asserting that Keep had violated the license agreement since the injunction, and reasserting the existence of an adequate remedy at law. The court heard evidence on three consecutive days on the issue of whether the Free Street Theatre was a "legitimate live theatrical production" within the meaning of section 4.01 of the license agreement. An evidentiary hearing was held at which parol evidence was introduced over plaintiff's objection, to determine the proper construction of the phrase "legitimate live theatrical production" as within the contemplation of the parties when they entered into the agreement. The court heard testimony by an officer of the parent corporation of APTHC, Keep's president, and attorneys for the parties who had participated in the negotiations. None of the witnesses could recall with specificity the discussions which took place during negotiations. There was conflicting testimony regarding the extent to which "name stars" and "the kind of shows that had been in the theatre before" influenced the use of the phrase "legitimate live theatrical productions". There was also testimony by Keep's president, David Lonn, to the effect that "legitimate theatre" denoted a live performance, other than vaudeville or concerts; that a "legitimate" play is one that is based on an outline or a script that tells a story; and that "legitimate" by definition does not exclude commingling of actors and audience, or improvisational work.

At the conclusion of the evidentiary hearing, the court held that the performances given by the Free Street Theatre on April 6 and 7 were not "legitimate live theatrical productions" within the contemplation of the

parties under the license agreement nor within the meaning of the preliminary injunction order of March 31, 1976, and that the performances scheduled after April 7, 1976, likewise would not have satisfied the requirements of the license agreement or the preliminary injunction and therefore the theatre had been closed inexcusably for a sufficient number of days to exhaust the total permissible under the agreement. The court accordingly dissolved the preliminary injunction, restored APTHC to the exclusive possession of the theatre and enjoined Keep from further occupying the premises. This interlocutory appeal and cross-appeal followed.

Plaintiff Keep contends that the trial court erred in admitting parol evidence to clarify the term "legitimate live theatrical production" since the term was not ambiguous as a matter of law and has a plain and clear meaning. Even assuming that the phrase was ambiguous, Keep contends that the court's holding was contrary to the manifest weight of the evidence in that there was no evidence of any explicit discussion or statement regarding "any specific representation concerning the meaning of the term in question." Keep asserts its position that since the court based its findings on the contemplation of the parties when they entered the license agreement, and the evidence showed that APTHC was more than adequately represented by counsel, such high degree of legal expertise "militates against fence-mending variations of a negotiated contract." Keep argues that had APTHC specifically understood the phrase "legitimate live theatrical production" as clearly excluding a certain type of entertainment, e.g., Free Street Theatre, then surely they would have clarified the term during the drafting process. Keep apparently concludes that assuming there is an ambiguity in the contract for the purpose of justifying the admission of parol evidence, the court's construction of the allegedly ambiguous phrase is against the manifest weight of the evidence since the evidence showed that APTHC was adequately represented by counsel who would have insisted on using different language had the phrase used not adequately expressed what the parties contemplated. Therefore, the manifest weight of the evidence does not support a finding that the Free Street Theatre was not the type of production envisioned by the parties since there was no evidence that an exclusion of performances of the Free Street Theatre genre was contemplated. The term "legitimate live theatrical production" therefore should be defined in terms of the dictionary definition, supported by the expert testimony presented by Keep's president, David Lonn, which was the only direct evidence in the record as to the meaning of the phrase. The presentations of the Free Street Theatre fell within those definitions. However, Keep apparently does not argue with the court's finding that

the Free Street Theatre would not be "legitimate live theatrical production" if that phrase was properly defined by the court in terms of the kind of shows involving "name stars" that had been in the theatre before.

■■ Plaintiff argues that absent an ambiguity in the terms of an agreement, no parol evidence is admissible. However, the primary object of the construction of a contract is to give effect to the intention of the parties. (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 283, 154 N.E.2d 683.) This can be accomplished by focusing on the words used by the parties and then drawing back and testing their meaning in the context of the entire contract, the circumstances surrounding its execution and the manner in which the parties interpreted it by their performance. (*International Minerals & Chemical Corp. v. Husky Oil Co.* (7th Cir. 1973), 485 F.2d 153, 158.) In order to be able to enforce a contract according to the sense which the parties mutually understood at the time it was made, the court must give greater deference to the parties' intent than to any particular words they may have used to express that intent. (*Stevens v. Fanning* (1965), 59 Ill. App. 2d 285, 290, 207 N.E.2d 136.) Initially, the court must determine whether this intent can be established by the words of the contract alone, or whether some recourse must be had to extrinsic evidence.

> "If the court is satisfied that the parties have expressed themselves and their intent clearly, the agreement is pronounced unambiguous and is enforced as written. However, to determine this lack of ambiguity, the courts frequently admit extrinsic evidence provisionally, not for the purpose of 'varying or contradicting' the writing, but to determine the fact that it is indeed unambiguous." (Footnotes omitted.) (4 Williston, Contracts §601, at 311 (3d ed. 1961).)

The court properly admitted relevant parol evidence of the negotiations between the parties and the context within which the term "legitimate live theatrical productions" was used to determine initially if there was an ambiguity in the contract and if there was, to then determine the proper resolution of that ambiguity. (3 Corbin, Contracts §579, at 421-22 (1960); *Baird & Warner, Inc. v. Ruud* (1976), 45 Ill. App. 3d 223, 229, 359 N.E.2d 745; *Lucie v. Kleen-Leen, Inc.* (7th Cir. 1974), 499 F.2d 220; *Ortman v. Stanray Corp.* (7th Cir. 1971), 437 F.2d 231.) Having found such uncertainty as to the implication of the use of "legitimate live theatrical productions" the court was justified in admitting extrinsic evidence so long as it did not change or vary the agreement. *Baird & Warner v. Ruud* (1976), 45 Ill. App. 3d 223, 229, 359 N.E.2d 745; *Arrington v. Walter E. Heller International Corp.* (1975), 30 Ill. App. 3d 631, 333 N.E.2d 50.

■■ Once the court admits parol evidence to determine the intention of the parties from all facts surrounding the formulation of the contract, the construction given the contract by the trial court will not be set aside unless contrary to the manifest weight of the evidence. (*Herbert Shaffer Associates, Inc. v. First Bank* (1975), 30 Ill. App. 3d 647, 653, 332 N.E.2d 703; *Spitz v. Brickhouse* (1954), 3 Ill. App. 2d 536, 123 N.E.2d 117.) Varying inferences could have been drawn from the evidence presented as to whether the parties intended the phrase "legitimate live theatrical productions" to reflect their discussions regarding the types of plays which had been at Arlington Park Theatre previously and the use of name stars. The court also heard evidence regarding the insertion of the clause allowing fashion shows, and the addition of a "prior written consent" clause when the subject of rock concerts came up during negotiations. The conclusions of the court are entitled to the same weight as a jury verdict and will not be upset unless manifestly against the weight of the evidence. (*Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 102, 163 N.E.2d 518.) There was ample evidence to support the conclusion of the court that the performances by the Free Street Theatre on April 6 and 7, 1976, were not "legitimate live theatrical productions" as contemplated by the parties when they entered the license agreement. We therefore will not disturb the judgment of the trial court in finding that plaintiff had not complied with the terms of the license agreement by presenting the Free Street Theatre performances.

Plaintiff next contends that the trial court erred in applying its findings of fact prospectively. The court, having decided that the performances of the Free Street Theatre were not "legitimate live theatrical productions" within the contemplation of the parties under the agreement, went on to hold that the performances scheduled after April 7, 1976, would not have satisified the requirements of the license agreement and therefore the theatre would be inexcusably closed in excess of the number of down days permissible under the agreement. Accordingly, the trial court enjoined Keep from further occupying the premises.

■■ The court had heard testimony that Keep had no productions other than the Free Street Theatre scheduled to perform at any time after the preliminary injunction was issued. Free Street Theatre performances were to continue until at least May 4, 1976 and possibly up until September 20, 1976, the expiration date of the license agreement. The production contract with Free Street Theatre was to run indefinitely, and was cancellable only upon two weeks prior notice. Illinois courts have recognized that when a party to an executory contract manifests a definite and unequivocal intent that it will not render its performance under the contract when the time fixed for performance arrives, the other contracting party may treat the contract as ended.

"When a party bound by an executory contract gives notice of his intention not to comply with his obligations, the other contracting party may accept such notice as an anticipatory breach and treat the contract as ended without waiting for the completion of the contract by its terms. [Citations.]" (*Stonecipher v. Pillatsch* (1975), 30 Ill. App. 3d 140, 142, 332 N.E.2d 151.)

The evidence adduced at the hearing clearly showed that Keep was committed to continue with the Free Street Theatre and could not cancel that obligation without giving two weeks prior notice. Keep argues that the explosion at the theatre premises on April 8 again tolled the running of the terms of the agreement, and that the term would not resume running until Keep was served with notice from APTHC of an estimate of the length of time needed for repairs. Keep takes the position that it could have terminated the contract with the Free Street Theatre during this time and been ready with another production. We are unconvinced, however, that the explosion of a bomb at the theatre should be such a propitious occurrence as to give plaintiff new life in the face of what would otherwise be adjudged conduct terminating the contract. It was well within the discretion of the trial court to determine that Keep could not comply with the terms of the license agreement and therefore to treat the total number of permissible down days as exhausted.

Defendant APTHC cross-appeals on the ground that the court erred in failing to dissolve the injunction for want of equity since plaintiff had an adequate remedy at law. However, we view that question as contingent upon the outcome of this appeal, and in light of our conclusion do not find that it warrants our attention.

For the foregoing reasons, the court's order *nunc pro tunc* April 15, 1976 is affirmed, and the cross-appeal is dismissed.

Affirmed.

McNAMARA, and McGILLICUDDY, JJ., concur.