In re The ESTES GROUP, INC., an Illinois Corporation, Debtor.

Midwest Generation EME LLC, Defendant/Cross–Claimant/Counter–Plaintiff/Third Party Plaintiff,

v.

The Estes Group, Inc., Defendant/Cross–Claimant/Cross–Claim Defendant,

and

Alford Services, Inc., Third–Party Defendant.

Bankruptcy No. 01 B 15312.
Adversary No. 01 A 00800.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Sept. 17, 2003.

Douglas K. Morrison, Morrison & Mix, Chicago, IL, for Plaintiff.

John V. Hanson, Hanson and Hanson, Morris, IL, Charles J. Myler, Richard G. Larsen, Myler, Ruddy & McTavish, Aurora, IL, Cindy Johnson, Johnson & Associates, Chicago, IL, for Third Party Defendant.

Paul E. Kelly, Hoffman, Burke and Bozick, Chicago, IL, Joel J. Sprayregen, Shefsky & Froelich, Ltd., Chicago, IL, Richard M. Bendix, Schwartz, Cooper, Greenberger, Krauss, Chtd., Chicago, IL, William L. Caughman III, Kean, Miler, Hawthorne, D'Armond, McCowan & Jarman, LLP, Baton Rouge, LA, Kevin L. Kolton, Jason M. Torf, Schiff, Hardin & Waite, Chicago, IL, for Defendant.

Stephen Wolfe, Office of the U.S. Trustee, Chicago, IL, for the U.S. Trustee.

James M. Dash, Norman B. Newman, Much, Shelist, Feed, Denenberg, Ament & Rubenstein, PC, Chicago, IL, for the Debtor.

## MEMORANDUM OPINION

PAMELA S. HOLLIS, Bankruptcy Judge.

The Debtor Estes Group, Inc. ("Estes") contracted with Midwest Generation, EME, LLC ("MWG") to provide personnel or "staff augmentation" services on MWG projects. Estes entered into a subcontract with Alford Services, Inc. ("Alford"), which required Alford to supply personnel for MWG projects. Alford did not receive full payment from Estes for its performance under the subcontract and asserted a mechanic's lien, seeking funds owed to Estes by MWG under the CSA. MWG is a stakeholder in this dispute, having indicated it will pay over the balance due under the CSA in accordance with the court's order.

This matter comes before the Court on Estes' motion for summary judgment against Alford. According to Estes, the undisputed facts confirm that Alford is not entitled to a lien under the Illinois Mechanics Lien Act because the contracts

involved are not "project-specific."[1] The Court denies Estes' motion for summary judgment.

Jurisdiction exists pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

*Undisputed Facts*

The following facts are not disputed. On September 1, 2000 Estes and MWG entered into a Consulting Services Agreement, which provided in part that Estes was to supply "...services as an independent contractor to the Company [MWG] as described in separately executed engagement letters or schedules...Each Engagement Schedule will describe the services to be performed by Consultant ('Services') and the work product of other deliverables to be provided to the Company..." ("Consulting Services Agreement" or "CSA"). ("[MWG]" added) Estes 402(M) stmt. exhibit 9, at ¶ 2.[2] During oral argument and in its legal memorandum, Alford stated that none of the parties produced any "Engagement Schedules" and none were submitted in connection with this motion. Alford's Memorandum in Opposition to Motion for Summary Judgment Filed by the Debtor, the Estes Group, Inc. ("Alford Mem.") at 3. Alford asserts that particular job sites were identified in purchase orders issued by MWG to Estes. Alford 402(M) reply at ¶ 2. Alford produced one such purchase order, dated December 4, 2000. This particular purchase order was issued by MWG and identified the personnel services needed by individual name and job location. *Id.* at exhibit A. Paragraph 15 of the CSA stated that notices to MWG required "...a copy to: Applicable Station as noted on each Purchase Order." 402(M) stmt. exhibit 9 at 7.

The third paragraph of the CSA acknowledged that either Estes would provide the contracted services to MWG or it would "...obtain the personnel to provide the services set forth herein..." *Id.* at 1. On the same day it executed the CSA, Estes entered into an agreement with Alford captioned: *"Sub–Contractor Agreement For Contracted Services Through the Estes Group, Inc. To Midwest Generation EME, LLC"* ("Subcontract"). 402(M) stmt. exhibit 5. The initial clauses of the Subcontract described the work sub-let to Alford as follows:

This SUB–CONTRACTOR AGREEMENT dated September 1, 2000 (the "Agreement") is entered by and is between THE ESTES GROUP, INC., an Illinois Corporation ("Prime"), and Alford Inspection, Inc. ("Sub-contractor") for services to be provided by Sub–Contractor at Midwest Generation EME, LLC (hereinafter "MWG").

WHEREAS, Prime has entered into an Agreement with MWG to provide contracted services.

WHEREAS, Sub–Contractor is engaged in the business of providing contracted services; and

WHEREAS, Prime desires to engage Sub–Contractor to provide contracted services.

*Id.* at 1.

The Subcontract terminated upon 30 days prior written notice by either party,

---

**1.** Estes asserted additional grounds for summary judgment, but announced at oral argument that it would proceed only with the "project-specific" theory.

**2.** The Court notes that on June 1, 2003, the Bankruptcy Court for the Northern District of Illinois adopted new local rules. Pursuant to the new rules, the parties' 402(M) and 402(N) statements are now responsive to Local Rules 7056–1 and 7056–2 respectively.

"...or immediately upon termination of the contract between Prime and MWG,..." *Id.* at 2, ¶ 2. The "...failure of Sub-Contractor to provide all of the services required by MWG in a professional manner, acceptable to MWG..." also terminated the Subcontract. *Id.* at 2, ¶ 2(b). Alford was required to purchase insurance "...as set forth in the MWG Insurance Requirements, with such carriers as MWG deems acceptable." *Id.* at 3, ¶ 4. The Subcontract also required Alford to indemnify both Estes and MWG. *Id.* at 3, ¶ 4 [misnumbered actual ¶ 5]. Alford was entitled to payment under the Subcontract only for "services provided to and approved by MWG." *Id.* at 4, ¶ 6.

Pursuant to this Subcontract Alford retained individual laborers as independent contractors to perform the services required by MWG. 402(M) stmt. at ¶ 5. The personnel supplied by Alford reported directly to MWG. 402(N) stmt. at ¶ 7. The Subcontract indicated that "[t]he services provided to MWG shall be carried out at the location(s) designated by MWG..." 402(M) stmt. exhibit 5 at ¶ 1(b). The services rendered by Alford for the Unit 8 Outage at Joliet Station 29 are the sole subject of its lien claim. 402(M) stmt. at ¶ 4. At the Joliet Station 29 project, Alford supplied several individuals, including Curtis Odum, who was the "managing agent" for Alford on that project. *Id.* at ¶¶ 5, 6. Mr. Odum described himself as the "quality control/safety/contract administrator" at the Joliet Station 29 facility. *Id.* at ¶ 7. Alford also acknowledged that it provided personnel under the Subcontract to other MWG job locations, including Powerton and Crawford Stations. 402(N) reply at ¶ 4. Alford was not paid in full for Subcontract services rendered in connection with the Joliet Station 29 facility. *Id.* at 16, ¶ 17.

*Legal Discussion*

Estes' motion for summary judgment offered a number of reasons why Alford's services did not establish a mechanics lien claim, including that the lien was untimely. During oral argument, Estes elected to rely solely on its theory that because the CSA and Subcontract were not "project-specific" Alford's work did not trigger a mechanics' lien. As a result, the Court limits its decision to that issue only and makes no findings on whether Alford timely filed the lien or other matters initially asserted in the motion for summary judgment.

The purpose of a mechanics lien act is to protect contractors where they have furnished labor and materials for the benefit of property owners but have not been paid. In general, the contractor can assert a lien on the owner's property, foreclose, and sell the property to receive payment for the work incorporated into the project. Moreover, a lien is not only against the building erected, but extends to moneys to which a contractor is entitled. *Nelson v. Urban,* 236 Ill.App. 447 (1925); *Capitol Plumbing & Heating Supply, Inc. v. Van's Plumbing & Heating,* 58 Ill. App.3d 173, 15 Ill.Dec. 617, 373 N.E.2d 1089 (1978). Pursuant to the Illinois Mechanics Lien Act:

> Any person who shall by any contract or contracts, express or implied, *or partly expressed or implied,* with the owner of a lot or tract of land, or with one whom the owner has authorized or knowingly permitted to contract, to improve the lot or tract of land or to manage a structure thereon, ...or perform any services or incur any expense as an architect, structural engineer, professional engineer, land surveyor or property manager in, for or on a lot or tract of land for any such purpose; or drill any water well thereon; or furnish

or perform labor or services as superintendent, time keeper, mechanic, laborer or otherwise, in the building, altering, repairing or ornamenting of the same; or furnish material, fixtures, apparatus, machinery, labor or services, forms or form work used in the process of construction where concrete, cement or like material is used, or drill any water well on the order of his agent, architect, structural engineer or superintendent having charge of the improvements, building, altering, repairing or ornamenting the same, is known under this Act as a contractor, and has a lien upon the whole of such lot or tract of land and upon adjoining or adjacent lots or tracts of land of such owner constituting the same premises and occupied or used in connection with such lot or tract of land as a place of residence or business; *and in case the contract relates to 2 or more buildings, on 2 or more lots or tracts of land, upon all such lots and tracts of land and improvements thereon for the amount due to him for such material, fixtures, apparatus, machinery, services or labor,* and interest at the rate of 10% per annum from the date the same is due...

770 Ill. Comp. Stat. § 60/1 (2003) (emphasis added).

 Protection is not limited to persons supplying materials to those in direct contractual relation with the original contractor but includes sub-contractors, second-tier sub-contractors, and more remote subcontractors. *A.Y. McDonald Mfg. Co. v. State Farm Mut. Auto. Ins. Co.,* 225 Ill. App.3d 851, 858, 167 Ill.Dec. 354, 587 N.E.2d 623, 629, *cert. denied,* 145 Ill.2d 631, 173 Ill.Dec. 1, 596 N.E.2d 625 (1992). *See also* 770 ILCS 60/21 (2003), which grants subcontractors a lien in the proceeds due to the contractor from the owner, provided the subcontractor complies

with the statute's requirements in asserting the lien. Consequently, Alford's failure to directly contract with MWG does not alone bar its lien claim on the proceeds due from MWG to Estes.

 Mechanics lien statutes must be strictly construed with reference to all the statutory requirements upon which a lien depends. *Northwest Millwork Co. v. Komperda,* 338 Ill.App.3d 997, 1000, 273 Ill.Dec. 90, 788 N.E.2d 399, 402 (2003). Also, in order for a subcontractor or supplier to receive the benefits of the statute, strict compliance with the terms of the statute is necessary. *Board of Library Trustees of Village of Westmont for Use and Benefit of Ozinga Bros., Inc. v. Cinco Const., Inc.,* 276 Ill.App.3d, 417, 425, 213 Ill.Dec. 3, 658 N.E.2d 473, 479 (1995). However, after a contractor complies with the statutory prerequisites, the Act should be liberally construed to carry out its remedial purpose. *Abbott Elec. Const. Co. v. Ladin,* 144 Ill.App.3d 974, 981, 98 Ill.Dec. 924, 494 N.E.2d 1251, 1256 (1986); *First Fed. Sav. & Loan Ass'n v. Connelly,* 97 Ill.2d 242, 246, 73 Ill.Dec. 454, 454 N.E.2d 314, 316 (1983).

During oral argument Alford agreed that its mechanic lien rights were "derivative" of Estes' rights, so if Estes could not assert a mechanic's lien against an MWG project for the type of services provided under the CSA, Alford could not. This is consistent with Illinois law:

> The right of a subcontractor to a lien is dependent upon the contract between the owner and the contractor. If there is no contract between the owner and the contractor under the terms of which a lien may be established, then the person furnishing material to a subcontractor can not establish a lien for such material.

*Douglas Lumber Co. v. Chicago Home for Incurables*, 380 Ill. 87, 95, 43 N.E.2d 535, 539 (Ill.1942).

▮ Estes argues that because its CSA did not refer to any particular services or job locations with MWG, the CSA is not "project-specific" and cannot qualify as a contract giving rise to a lien against MWG as a matter of law. If the CSA could not establish a lien against MWG by Estes, then Alford's Subcontract of the CSA obligations also cannot trigger a lien. The problem with this argument is two-fold. First, whether the CSA is or is not "project-specific" is subject to reasonable dispute between the parties, precluding a summary judgment. Second, Estes assumes, without any support, that "project-specific" is equivalent to expressly including specific job locations and service descriptions in the CSA. However, the Illinois Mechanics' Lien Act does not mandate that the contractor's written agreement with the owner expressly detail job locations or services.

Estes' theory stems from a misreading of *Onsite Engineering & Mgmt., Inc. v. Illinois Tool Works, Inc.*, 319 Ill.App.3d 362, 253 Ill.Dec. 195, 744 N.E.2d 928 (2001). This case turned on whether Onsite Engineering & Management, Inc., a temporary staffing agency ("Onsite"), was a subcontractor or secondary subcontractor pursuant to a National Services Agreement. The court found that because Onsite was neither a subcontractor nor secondary subcontractor, it was not entitled to a mechanics lien. "A subcontractor, in general, is one who has entered into a contract, express or implied, for the performance of an act with the person who has already contracted for its performance." *Id.* at 932.

In *Onsite*, Smith Technology Corporation ("Smith") agreed with general contractor QST to perform certain work on a Lincolnwood, Illinois project. *Id.* at 930. In a separate "National Services Agreement" between Smith and Onsite, Onsite promised to be Smith's sole source provider of contract employees ("NSA"). *Id.* The NSA did not refer to any type of work, project or location of projects. *Id.* Pursuant to the NSA, Onsite provided temporary employees to Smith for various projects in several states, including Illinois. Onsite's complaint alleged that it supplied laborers to perform environmental remediation work for the Lincolnwood project. *Id.* The complaint further alleged that Smith failed to pay Onsite the full amount due for its services. *Id.* As a result, Onsite sought to foreclose a mechanic's lien on the Lincolnwood owner's property and obtain judgment against QST, the general contractor. *Id.* The project owner moved to dismiss, arguing that Onsite's temporary staffing agency was not a subcontractor or secondary subcontractor entitled to a lien under the Mechanics Lien Act. *Id.* The Appellate Court of Illinois agreed. *Id.* at 932.

In *Onsite* the Appellate Court held that to qualify as a protected "subcontractor" under the Mechanic's Lien Act, Onsite must have contracted to perform a part or all of Smith's obligations *under Smith's contract with QST*, as opposed to merely assisting or benefitting Smith in performing Smith's direct obligations to QST. *Id.* In its reasoning, the *Onsite* court relied on the Colorado Court of Appeals' holding in *Skillstaff of Colorado, Inc. v. Centex Real Estate Corp.*, which held that the state's mechanics lien statute does not protect those who merely furnish labor for the contractor's benefit. 973 P.2d 674, 675 (Colo.App.1998). Where individuals physically provide labor, they may bring mechanics liens, but those who simply provide laborers to a subcontractor *without assuming responsibility for performance*

may not assert such liens. *Onsite*, 253 Ill.Dec. 195, 744 N.E.2d at 932, *citing Skillstaff*, 973 P.2d at 676 (emphasis added).

Although the Smith contract with QST obligated Smith to perform work on the Lincolnwood project, the Onsite and Smith NSA made no mention of the Lincolnwood project or QST. The NSA did not sub-let Smith's QST obligations to Onsite:

> Absent from the agreement is any reference to the Lincolnwood Project at issue. Thus, like the plaintiff in *Skillstaff*, Onsite had no contractual obligation to perform any work for this particular project. Rather, its obligation was to refer employees to Smith for projects located in various states on a continuing, as needed, basis. *In order for Onsite to be able to claim a lien against the property at issue here, it would have had to contractually obligate itself to perform a portion of the work which Smith contracted with QST to perform on the Lincolnwood Project.* However, it did not and thus is not a subcontractor or secondary subcontractor within the meaning of the Mechanics Lien Act.

*Onsite*, 253 Ill.Dec. 195, 744 N.E.2d at 932 (Emphasis added).

The whole point in this case is that Onsite was not a subcontractor because it never legally obligated itself under the NSA to perform *any* of Smith's contractual obligations to QST. The court noted that the NSA's failure to mention specific projects precluded any argument that there was some language in the NSA that created a subcontract of Smith's QST obligations to Onsite. It does not follow from this holding that if the NSA had contained an express clause subletting Smith's QST obligations to Onsite that the court would invalidate the subcontract because project details were not described.

The facts in this case are entirely different. Unlike the NSA, the Subcontract between Alford and Estes clearly subcontracted Estes' CSA obligations with MWG to Alford. The Subcontract is captioned as an agreement for services to MWG, and the "whereas" clauses expressly transferred Estes' MWG obligations to Alford. The CSA and Subcontract bear the same date. Moreover, the Subcontract required Alford to procure insurance satisfactory to MWG and to indemnify MWG as well as Estes. Finally, the Subcontract between Estes and Alford terminated when the CSA between Estes and MWG ceased. There is no indication that any such provisions existed in the NSA, so the Appellate Court in *Onsite* was left to search for *any* specific references to the QST Lincolnwood project. Without an express delegation or mention of a specific project, the Court could not **infer** that Smith subcontracted a portion of its QST obligations to Onsite pursuant to the NSA. In contrast to *Onsite*, there is no question that Estes subcontracted at least a portion of its CSA obligations to Alford due to the express clauses so stating in the Subcontract.

However, Estes further argues that the omission of specific project and service descriptions in the CSA dooms Alford's lien. Notwithstanding Estes' sub-let of CSA obligations to Alford, Estes insists that the CSA itself lacks project and service details. So, if Alford's lien rights are derivative, and Estes had no lien rights under the CSA, Alford cannot claim a lien. Estes assumes that *Onsite* mandates specific project and service descriptions in all contracts under all circumstances. However, based on the analysis above, the Court concludes that *Onsite* does not stand for the general proposition that a written contract omitting specific project or service descriptions bars a mechanics lien. Instead, *Onsite* held that a supplier of services cannot be a subcontractor if there

is no subcontract obligating the supplier to perform a portion of the contractor's work. In the absence of an express sub-let of duties or mention of the project in question, the *Onsite* court refused to infer a subcontract from language in the NSA.

■ However, even if *Onsite* is construed to require every contract to detail project locations and describe services, Estes cannot prevail at the summary judgment stage. First, the Court does not accept that "project-specific" means job locations must be expressly listed in the CSA. In some instances "project-specific" could just as well refer to the owner or prime contractor MWG. The CSA contemplates work to be performed at multiple locations. In addition to "Engagement Schedules," the CSA mentions "purchase orders" and "applicable station" in its notice provisions, sufficiently establishing at this stage that the "project" in the CSA relates to work for various MWG power stations. Alford's claim involves one of MWG's power stations.

■ While the parol evidence rule excludes extrinsic evidence that contradicts a written contract, oral testimony and other documents are admissible to explain ambiguities in a contract. *Sunstream Jet Express v. Int'l Air Serv. Co.,* 734 F.2d 1258, 1268 (7th Cir.1984):

> ... recent Illinois decisional law clearly provides that when interpreting a contract, parol and extrinsic evidence is only admissible at trial, for consideration by the trier of fact, if the trial court determines, as a matter of law, that the contract is ambiguous. In determining the issue of ambiguity, as a matter of law, the trial court may consider parol and extrinsic evidence. *URS Corp. v. Ash,* 101 Ill.App.3d 229, 235, 56 Ill.Dec. 749, 427 N.E.2d 1295, 1300 (1981); *Keep Prod., Inc. v. Arlington Park Towers Hotel Corp.,* 49 Ill.App.3d 258, 263, 7

Ill.Dec. 648, 364 N.E.2d 939, 943 (1977); *Baird & Warner v. Ruud,* 45 Ill.App.3d 223, 229, 3 Ill.Dec. 886, 359 N.E.2d 745, 750 (1976).

Purchase orders with project specifics, timesheets and invoices detailing location and type of work performed, or oral testimony, is particularly appropriate here since the CSA referred to "Engagement Schedules" to describe the services and work, and no such schedules have surfaced. This creates a patent ambiguity in the CSA, which permits Alford to introduce both oral and written evidence at trial to explain and detail the work and services called for under the CSA. *See BRL Carpenters, Ltd. v. American National Bank & Trust Co.,* 126 Ill.App.3d 137, 81 Ill.Dec. 364, 466 N.E.2d 1166 (1984), where oral testimony was permitted to supplement written AIA contractual provisions in order to determine what work qualified for a mechanics lien. Alford's response to Estes' motion for summary judgment, together with its exhibits, sufficiently creates an issue of fact regarding the specificity and nature of the CSA and Subcontract agreements.

*Conclusion*

For the reasons stated herein, Estes' Motion for Summary Judgment is denied.