Continental Television Corporation, et al., Plaintiffs-Appellants, v. Josephine B. Caster, as Executrix of the Last Will and Testament of Louis E. Caster, Deceased, et al., Defendants-Appellees.

### Gen. No. 11,647.

Second District, First Division.

June 14, 1963.

Rehearing denied July 27, 1963.

Sears, Streit, Tyler & Dryer, of Chicago, and Brown, Connolly & Paddock, of Rockford (Barnabas F. Sears, David Connolly, Robert J. Oliver and Gerald M. Sheridan, of counsel), for appellants.

Pedderson, Menzimer & Conde, of Rockford, for appellees.

SMITH, J.

Bob Hope, Albert Zugsmith, Arthur Hogan and Ashley Robison negotiated for the purchase of all the capital stock of Greater Rockford Television, Inc. for $2,850,000. Plaintiff, Continental Television Corporation, wholly owned by Hope and his associates and apparently organized for the purpose of this transaction, deposited $20,000 as earnest money, agreed to pay an additional $480,000 on the closing date of the contract and the remainder in installments thereafter. The rights, duties and obligations of the several parties were reflected in a contract which is the subject matter of this controversy.

Plaintiffs claimed they had terminated the contract and sued for the return of the earnest money. The defendants, stockholders in Greater Rockford Television, Inc., counter-claimed for the $480,000 against Hope and associates who had guaranteed its payment and for damages against Continental. The trial court held for the defendants on the original suit and denied recovery of the $20,000 by Continental. It found for the counter-plaintiffs on each aspect of their counter-claim and entered judgment against Continental for $1,211,910 and against Hope and his associates on their guarantee for $480,000, with the proviso that the $20,000 (then in the hands of the clerk of the court) be credited on the latter judgment. From these judgments the plaintiffs appeal.

The issues concern themselves with an interpretation of the contract and by whom, when and in what manner the contract could be terminated. The contract stated that it was entered into

"by and between the undersigned shareholders of Greater Rockford Television, Inc., an Illinois

124

corporation, which shareholders are in the aggregate sometimes hereinafter referred to as 'First Parties', and Bob Hope, Albert Zugsmith, Arthur Hogan and Ashley Robison, sometimes hereinafter referred *to in the aggregate* as 'Second Parties', and Continental Television Corporation . . . hereinafter sometimes referred to as 'Continental.' " (Emphasis supplied.)

This contract was signed by the corporations mentioned, by Hope and associates individually and by the individual shareholders of the Rockford corporation. The concluding paragraph stated

"the respective corporate parties hereto have caused these presents to be executed by their respective proper corporate officers, and the individual parties hereto have hereunto set their respective hands and seals, . . . ."

Duties and obligations were imposed on the individuals composing each group and it is the purest sophistry to conclude that the individuals themselves were not parties to, nor bound by, the contract. In view of the unequivocal language above quoted there seems to us little doubt that the term "parties" include the corporations, each as an entity, and all signatory individuals, each as an entity.

The litigious storm which we review centers around the use of the words "in the aggregate" and its application to paragraph 17 of the contract relating to termination. Paragraph 17 reads as follows:

"In the event the closing date as hereinafter defined does not occur within one hundred eighty (180) days of the filing of said application for approval with the Federal Communications Commission, then either party hereto may terminate this agreement, provided:

125

(a) That ten (10) days written notice previous to termination is given by the party desiring terminate; and

(b) That the closing date has not been delayed by reason of the act or default, directly or indirectly, of the terminating party (or any of the individuals comprising First Parties and Second Parties, as the case may be)."

It will be noted that no one could terminate the contract for one hundred eighty (180) days immediately following the filing of the application for the necessary permits with F. C. C. On the 181st day, Hope, individually, purporting to act under this paragraph, advised Rockford of his intention to terminate and, on that day, gave appropriate notice of termination. He was promptly advised by Rockford that such notice could only be given by Second Parties in the aggregate and his individual notice was and would be treated as a nullity. Hope apparently acquiesced in this view and this understanding of the contract or, at least he concluded that his notice of termination was of dubious legal efficacy and that it could not safely be relied upon as an effective termination of the contract.

Hope then turned to Continental as a vehicle of termination and Continental then gave notice of termination. Upon receipt of this notice Stanley H. Guyer, attorney for Rockford, wrote to the attorneys for Hope and Continental suggesting that the sufficiency of this notice to invoke the provisions of Paragraph 17 was dependent upon whether the president of Continental was properly authorized by the Board of Directors to sign the notice on behalf of Continental. He further suggested that, if he was, it would be incumbent upon L. E. Caster, agent, to return the earnest money payment to Continental. He further stated

126

that Zugsmith was demanding that the $20,000 be returned to him. Martin Gang, attorney for Continental, forwarded a certified copy of the terminating resolution of Continental and stated that four members of the Board of Directors, naming them, were present and that they constituted a majority of the six member board and had all voted affirmatively. He demanded the return of the $20,000 to Continental as the contract required. A few days later the Circuit Court of Appeals affirmed the F. C. C. in approving the transaction and Guyer gave notice of closing as required by the contract. Plaintiffs did not appear and, subsequently filed the instant suit when the $20,000 earnest money was not forthcoming.

■■ Continental contends that the contract authorized Hope as an individual to terminate and that he did so effectively. If this is not true then Continental was authorized to and did terminate and the return of the $20,000 to Continental is proper. Defendants contend that the contract could not be terminated by Hope individually under its terms, that the word "either" referred only to First Parties in the aggregate and Second Parties in the aggregate, and that Continental was not intended to have the authority to terminate. Thus, when Continental defaulted on the closing date it breached the contract and must respond in damages.

It is but ritualistic rote to say that courts in the interpretation of any document seek to find the true intent and purposes of the parties and that they should, if possible, determine such within the four corners of the instrument. We think that a determination may be made here, with, perhaps, an assist from the conduct of the parties. The guide-posts for us have been succinctly stated by the Supreme Court in Martindell v. Lake Shore Nat. Bank, 15 Ill2d 272, page 283, 154 NE2d 683, page 689, as follows:

"A contract, however, is to be construed as a whole, giving meaning and effect to every provision thereof, if possible, since it will be presumed that everything in the contract was inserted deliberately and for a purpose. (Hartley v. Red Ball Transit Co., 344 Ill 534). The intention of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself, but each part of the instrument should be viewed in the light of the other parts. (Citations.)

Applying this yard-stick, it is readily apparent that the purpose of this contract was to transfer collectively all of the shares of Rockford to Continental as the purchaser for the collective benefit of Hope and associates. The trustee, the Rockford and Continental corporations were convenient legalistic vehicles to accomplish this end. It was the shareholders of Rockford and the shareholders of Continental, each collectively, who were the real parties in interest. We have already determined that all signatory parties were included in the term "parties." This brings us to the question whether the words "then either party hereto may terminate" refer to any signatory party or whether it has a different meaning as used in Paragraph 17.

The resolution of this question is not free from doubt. By following Hope's termination with a termination by Continental, the plaintiffs by their actions tacitly "went along" with Rockford's interpretation of the contract that termination by Hope and his associates must be "in the aggregate" and thus impliedly acquiesced in the thought that such was the intention and purpose of the parties in drafting the contract. They, at least, concluded that Hope's attempt to terminate was of dubious legal efficacy and an unsafe vehicle to travel in. We think they

128

displayed perspicacity in so doing. This was a sizeable contract, involved no small sum and sought to bind multiple parties to the accomplishment of a single purpose. It seems just common sense that its continued existence would not be left to the whims and vagaries of an individual dissident member of either group. Indeed by making them parties signatory the contract sought to avoid this very possibility. This is further borne out by the use of the words "or any individuals comprising First Parties or Second Parties as the case may be" in Paragraph 17(b). This clause is unnecessary if every individual was a party within the meaning of the contract. They would be included in the term "terminating party" as used therein. By the use of this language the contract says, in effect, that neither First Parties nor Second Parties may terminate if any individual of either group seeking to terminate delayed the closing. This would be true even if we construe the word "either" as "any" party as argued by the appellants. We therefore conclude that the language was carefully chosen, purposely inserted and precludes the thought that any individual had the right to terminate. Hope's attempt to terminate was beyond the rights conferred by the contract upon him and was and is a nullity.

We now turn to whether or not Continental had the right to terminate. Once again the conduct of the parties is illuminating. After receiving the certified copy of the terminating resolution of Continental, Mr. Guyer wrote:

> "The certified copy appears to comply with my first request to you of July 3rd in respect to the matter.
> "With respect to the return of the earnest money payment, please be advised that the shareholders of Greater Rockford Television, Inc. and Mr. L. E. Caster, agent, are all aware of the obli-

129

gation to return this earnest money payment pursuant to the provisions of paragraph 17 of the August 20, 1957 agreement."

Guyer also stated that Zugsmith was claiming the $20,000 as well as Continental and this placed Rockford in a dilemma. He suggested that the dilemma could be resolved by making the check payable to Zugsmith and Continental. Mr. Gang then wired Guyer as follows:

"By agreement of all parties you are to return earnest money to Bernard Reich as escrowee. You will receive confirming wire from Reich."

Reich was Zugsmith's attorney and confirmed the foregoing statement by the following telegram to Guyer:

"Confirming Gang's wire, send earnest money to me as escrowee. Hereby relieve your clients only of any responsibility by reason of termination and return of earnest money. Letter follows."

Nothing happened. About this time Guyer learned that Zugsmith was suing in California and taking the position that the Board of Directors meeting, at which Continental passed the terminating resolution, was illegal because only three directors were present out of the six, that four was a quorum, that since one resigned and the remaining three chose the fourth, such action was a nullity under the corporation bylaws. It is here that Guyer is accused of reversing his field and refusing to go along with the settlement. It is apparent that, if the Board of Directors meeting was illegal, then Continental had no legal basis for termination. We attach no impropriety in Guyer's conduct throughout the entire transaction and suggest he properly refused to acknowledge the termination if, as a matter of fact or law, it was illegal.

130

Rockford first contends that Continental had no right to terminate the contract as it was not a terminating party but, if it was, it had not legally terminated the contract. The use of the word "either" in Paragraph 17 is the basis for the claim that Continental was not a terminating party. The word "either" when used in connection with one of two alternatives, means either the one or the other. Black's Law Dictionary 4th Ed 1951; Chicago & N. P. R. Co. v. City of Chicago, 172 Ill 66, 49 NE 1006; CJS Vol 28, page 842. The citation last given also notes that in actual use the word either refers to some one or other of many and that its use in this sense "is not infrequent." Where there were several exceptions to a contract and indemnity would not be paid "by either of the foregoing causes" the court construed the word "either" to mean "any." Estabrook v. Eastern Commercial Travelers Accident Ass'n, 308 Mass 439, 32 NE2d 250 at 252; Watson v. Watson, 223 Mass 425, 111 NE 904; In re Brown's Estate, 434 Pa 19, 21 A2d 898 at 901. If the word "either" is ambiguous in the instant contract the conduct of the parties is illuminating in resolving the ambiguity. In a letter on March 21, Guyer wrote:

> "We must therefore take the position that any termination, pursuant to paragraph 17 of this agreement of August 20, 1957, referred to in your March 7, 1958 letter, must be taken, if at all, by the parties to the agreement as designated therein—that is to say, either by First Parties in the aggregate, or by Second Parties in the aggregate, or by Continental."

We have already referred to other communications looking toward a settlement of this matter wherein it appears that Rockford considered Continental to

have the right under Paragraph 17 to terminate. It does no violence to the language of the contract to construe it as Guyer did. The opening paragraph of the contract in effect sets out three principal contracting parties. It does no violence to the language of paragraph 17 to give each of the three the power of termination. It is abundantly clear by their conduct, all parties so construed this contract. In Keefer Coal Company v. United Elec. Coal Co., 291 Ill App 477, 492, 10 NE2d 210, the court said:

> "Where the contract is, in fact understood by one of the parties in a certain sense and the other party knows he so understands it, then the understanding is to be taken in that sense, provided this can be done without making a new contract between the parties."

Where, as here, all parties adopted and acted on this construction of the contract, there is no better extrinsic evidence of their intention than the interpretation they themselves placed on the contract. If that construction is reasonable, and we think it is, it can and will be adopted by the courts. Walker v. Illinois Central Railroad Company, 215 Ill 610, 618, 74 NE 812; Walters v. Walters, 409 Ill 298, 304, 99 NE2d 342; Northern Illinois Coal Corp. v. Cryder, 361 Ill 274, 284–285, 197 NE 750. This then brings us to the question as to whether Continental legally terminated the contract.

■ ■ The circumstances of the Board meeting are unusual. There were six directors prescribed by the bylaws. At the meeting where the termination of the contract was to be considered, only two directors appeared. They appropriately adjourned the meeting to a future day certain. On this second occasion three directors appeared, accepted the resignation of a fourth director and then filled the vacancy with a

member of Hope's firm of attorneys. The four directors then unanimously adopted the termination resolution. Rockford contends that the acceptance of the resignation and the filling of the vacancy by three directors was in contravention of Article 3, Sec 8 of the bylaws which reads as follows:

> "At all meetings of the board a majority of the directors shall constitute a quorum for the transaction of business and the act of a majority of the directors at which there is a quorum shall be the act of the board of directors, except as may be otherwise specifically provided by statute or by the certificate of incorporation."

At first blush it would appear that the position of Rockford is well taken and that the action of the three directors in filling the vacancy was done without a quorum of four present. However, Sec 2 of the bylaws was a re-enactment of the provisions of Sec 223 of the General Corporation Laws of the State of Delaware and it reads as follows:

> "Vacancies and newly created directorships resulting from any increase in the authorized number of directors, may be filled by a majority of the directors then in office, though less than a quorum, unless it is otherwise provided in the certificate of incorporation or bylaws . . . ."

We are of the opinion that the decision of the Delaware Court in In re Chelsea Exchange Corp., 18 Del Ch 287, 159 A 432 is controlling. In that case there were nine directors. Two resigned, leaving seven. Two of the seven met and filled the vacancies. At a subsequent meeting, with four directors present, the actions taken by the two were ratified. The four constituted a majority of the directors remaining but not a majority of the total membership of the board. The court said:

"The language (of the bylaw) certainly is not indicative of a purpose to require that reduction of the board below the quorum point should be a condition precedent to the function of a 'majority of the remaining directors.' It seems to me to be quite otherwise. It means that a majority of the remaining directors may elect regardless of whether a quorum of the board is left in the office or not. Thus if four of the directors who met on October 19, 1931 did in substance elect Pratt and Traver they exercised a lawful power for they were a majority of the remaining directors."

This, we think, is applicable to the case at bar. Hogan, one of the original directors, resigned by letter dated June 6th and delivered June 17 "effective immediately." At the adjourned meeting on July 2nd only five directors remained in office. Three of the remaining five or "a majority of the directors then in office" met and filled the vacancy. When the new director accepted his office on the day of the election and then took part in the meeting a quorum was present. The resolution of termination subsequently adopted was the valid act of the Board of Directors. It should be further here noted that Rockford knew of this situation at the time it was negotiating for settlement. We further observe that the bylaws of a corporation are rules adopted by a corporation for its internal government in the management of its own affairs. 18 CJS Corporations, Sec 179. The right to question such an election is not open to strangers but only by a direct proceedings to those for whose benefit the bylaws were adopted, i. e. the directors, the shareholders or the corporation. 2 Fletcher Cyclopedia Corporations, Perm Ed, Sec 293.

█ It is further suggested by Rockford that we should pierce the corporate veil and hold that the

134

corporation was but the alter ego of Hope and his associates and that it would be a fraud to permit Hope, through his machinations, to accomplish through Continental, what he could not do individually. Suffice it to say, Continental was not created for the purpose of perpetrating a fraud. Its existence was known to Rockford from the beginning. Rockford dealt with it with full knowledge and imposed on it certain contract rights, duties and obligations. To hold that Continental is liable on the duties it assumed but should be ignored as to the rights given it in the contract is to perpetrate a fraud by judicial action. Rockford knew from the beginning that Continental was organized for the purpose of acquiring all of the stock of Rockford. Rockford required Hope and associates to guarantee personally the payment of the $480,000 at the time of closing the purchase. They knew from the beginning that Continental was but the alter ego of Hope and associates. Should it come as a surprise to Rockford that the parent would have the internal control of its corporate child? The case at bar does not come within the class of cases where the corporation is used as an instrumentality of fraud or to circumvent individual obligations. From the beginning Continental was a party to the contract. From the beginning its duties and its obligations were correlated to its rights. The exercise by it of those rights in a legal manner cannot justify the piercing of the corporate veil.

It would unduly lengthen this opinion to discuss other points raised in the briefs. Suffice it to say, they are insignificant and do not militate against the views herein expressed. Accordingly this cause must be reversed and remanded to the trial court with directions to vacate the judgments entered herein, to allow the motion of the plaintiffs for summary judgment for $20,000, to enter an appropriate judgment

135

thereon, and to enter an appropriate judgment in bar of the counterclaims.

Reversed and remanded.

McNEAL, PJ and DOVE, J, concur.