JOHN G. KOKINIS, d/b/a Lincoln Square Real Estate, Plaintiff-Appellant, *v.* EDWARD KOTRICH *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 78-436

Opinion filed July 3, 1979.—Rehearing denied July 31, 1979.

Lewis W. Schlifkin and Edward A. Berman, both of Chicago, for appellant.

Max A. Abrams and Sidney Z. Karasik, both of Chicago, for appellees.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Plaintiff John G. Kokinis, a licensed real estate broker, brought an action against the defendants Edward and Rita Kotrich to recover a commission allegedly due him under the terms of an exclusive listing agreement for the sale of a motel. Plaintiff appeals from a finding entered by the circuit court of Cook County in favor of defendants at the close of plaintiff's case. The issue on review is whether the trial court's action was correct which raises the question of whether the finding was against the manifest weight of the evidence.

Defendants owned the LaGrange Motel in Countryside, Illinois. On June 28, 1971, by signing a document entitled "North Side Real Estate Board Cooperative Listing Service Agreement," they employed plaintiff as their exclusive agent to advertise and offer for sale their motel for a price of $495,000. Defendants agreed to pay plaintiff a real estate brokerage commission of 6% on the first $50,000 and 5% thereafter, subject to certain conditions discussed later in this opinion. This agreement was to remain in force for a period of not less than 90 days and thereafter until terminated by the defendants in writing giving plaintiff 30 days prior notice. The agreement would terminate without this notice one year after the date it was signed.

Plaintiff prepared a flyer containing information about the property for distribution to prospective purchasers and advertised the motel in a series of classified newspaper ads beginning on July 11, 1971, and ending on September 19, 1971. The ads referred to a motel in the south LaGrange area and furnished the name and telephone number of plaintiff. The name

and address of the motel was not given. Plaintiff testified that defendants requested he be discreet as they did not want their customers or neighbors to know the property was for sale. Plaintiff would screen the phone calls he received regarding the property in order to find out whether the caller was interested. He also kept a record of the caller's name, address, and phone number. This record was admitted into evidence and showed that Robert Galas,[1] the ultimate purchaser of the property, called plaintiff regarding the property on September 14, 1971. Plaintiff testified that Galas inquired about the ad, requested a flyer be sent to him, and said he wanted to see the property. Plaintiff stated that thereafter he called Galas to find out if he received the flyer and whether he was interested in the property; that Galas told him that when he received the flyer he realized he had already seen the same property with someone else and was not interested in dealing with the plaintiff.

Plaintiff received from defendant Edward Kotrich a letter dated August 25, 1971, which read: "Please cancel our three-month listing agreement dated from June 28 to September 28, 1971." Plaintiff testified that when he received this letter, he called Kotrich and told him he had several people interested in the property and would continue to come in with a contract as long as he had thirty more days under the listing agreement. Plaintiff also asked for a further extension which Kotrich refused. Plaintiff then wrote a letter to Kotrich dated September 27, 1971, in which he stated that he received Kotrich's letter of August 25, 1971, requesting the cancellation of the real estate exclusive listing on September 28, 1971; he listed the names of persons, including the name Robert Galas, who had contacted him about the property and asked Kotrich to refer any one of them back to him if they should contact Kotrich personally; and he would continue working to bring in a contract as per their discussion. Plaintiff testified that when Kotrich received this letter, Kotrich called plaintiff and asked how he got Galas's name and whether plaintiff sent him a flyer. Plaintiff said that he sent Galas a flyer. According to plaintiff, Kotrich told him Galas was at the motel a couple of weeks before with his own broker and they were interested in buying the property together. Plaintiff told Kotrich that he should send Galas back to him, to which Kotrich responded, "Well, we will see."

Plaintiff testified that he spoke with Kotrich on October 1, 1971, regarding the possibility of bringing in a contract from a person he began dealing with in July 1971. Kotrich told plaintiff to keep working on it and to bring in a contract. Plaintiff stated that on October 4, 1971, Kotrich called him regarding the list of names plaintiff had sent him and was disturbed that Galas's name was on the list. Plaintiff told Kotrich that they

---

[1] Robert Galas at the time of trial was deceased.

had already discussed this, and that if Galas or anyone else contacted Kotrich, he should refer them back to plaintiff as agent of record.

Plaintiff testified that on October 23, 1971, Kotrich told him he was going ahead with the Galas deal, and that if plaintiff would cooperate, he would give him a $7,500 commission. Plaintiff said he told Kotrich he did not want to impair any deal, but that he had another interested person and would try to bring in a contract from that person. Plaintiff stated that on October 27, 1971, Kotrich called him, questioned his veracity about the other deal, and offered him a $5,000 commission. Plaintiff said he told Kotrich he was confident that he would be able to bring in a contract and would not have to negotiate for a commission.

Admitted into evidence was a letter dated October 28, 1971, addressed to plaintiff and signed by Robert Galas, in which Galas stated that on September 10, 1971, he telephoned plaintiff's office regarding an ad he had seen in the paper on July 18, 1971; that plaintiff told him information about the property would be mailed to him as no information could be given on the phone; that he received plaintiff's letter dated September 14, 1971, which informed him that the motel for sale was the LaGrange Motel; that he had been informed several months earlier by his own real estate broker, William Brash, that this motel was for sale; that at that time he discounted the LaGrange Motel because of his financial situation; that on October 1, 1971, he was able to secure additional finances; that he called Brash and they again discussed the LaGrange Motel; that on October 7, 1971, through Brash he made an offer on the motel; that on the same date he learned that plaintiff tried to reach him while he was out; that he reached plaintiff on October 11, 1971, at which time plaintiff asked him what he thought of the motel; that he informed plaintiff of the above facts, to which plaintiff responded, "Well, that's alright, I have an exclusive"; that he understood that plaintiff was now demanding, with threat of suit, a sales commission if he purchased the motel; that such action had hindered his negotiations and caused him a loss in time and money; that he would take legal action to recover losses and damages if the matter was not resolved; and that plaintiff was not his broker nor did he ever retain or request plaintiff to act in his behalf. Plaintiff stated that he did not converse with Galas any time after he received this letter.

Plaintiff testified that on November 4, 1971, Kotrich called him and asked how plaintiff's deal was coming along, to which plaintiff responded he was waiting for the attorney to give him the contract. Kotrich told plaintiff he would not wait any longer and was going ahead with the Galas deal. Plaintiff told Kotrich that was not fair and he would have to sue.

On cross-examination, plaintiff stated that none of the classified ads

gave the address of the motel property; that he had never seen Galas; that he did not actually show the property to Galas; and that he did not submit a written offer of purchase for the property to Kotrich.

Plaintiff was the only witness to testify at trial. At the close of the plaintiff's case, the trial court granted defendants' motion for a directed finding in their favor and entered judgment on the grounds that (1) plaintiff failed to prove he was the procurer of the purchaser, Robert Galas, and (2) the exclusive listing agreement expired 90 days after June 28, 1971, because written notice of cancellation was sent 30 days prior to the end of the 90-day period as provided by the listing agreement.

## I.

Plaintiff cites *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, for the proposition that directed verdicts should be granted only in cases in which all the evidence when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. While this standard applies to directed verdicts in a jury trial and is designed to prevent a trial judge from assuming the duties of the trier of fact, it does not apply in a case, as here, tried without a jury. *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 57, 349 N.E.2d 399.

■■ Section 64(3) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 64(3)) specially requires the trial court sitting without a jury to weigh the evidence when ruling on defendant's motion for judgment at the close of plaintiff's case. Instead of considering the evidence in the light most favorable to the plaintiff as in a jury trial, the court must consider the weight and quality of the evidence which necessarily includes any favorable to the defendant, and pass on the credibility of the witnesses. (*City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 57-58.) The trial court does not simply decide whether plaintiff has made out a prima facie case, but must make a final determination and enter judgment for defendant if plaintiff has not met his burden of proof by a preponderance of the evidence. (*Bau v. Sobut* (1977), 50 Ill. App. 3d 732, 735, 365 N.E.2d 724.) On review, the decision of the trial court should not be reversed unless it is contrary to the manifest weight of the evidence. *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 58.

## II.

Plaintiff argues that he is entitled to recover a commission for the sale of the subject property under the terms of the exclusive listing agreement. That agreement provided that defendants would pay plaintiff a commission: "(a) for [plaintiff's] services in procuring a purchaser of the property on the [terms specified in the agreement] or any other terms the

owner shall accept, or (b) if the property is sold by [plaintiff], by [defendants], or by or through any other person, during the period hereof, or (c) if the property is sold to anyone on behalf thereof to whom it was submitted, or sold after termination of this agreement to a purchaser to whom it was submitted or shown by [plaintiff] or [plaintiff's] representative during the term of this agreement."

### A.

Plaintiff contends that he is entitled to commission under section (b) since the agreement remained in effect until October 26, 1971, a date subsequent to the purchase of the property. The agreement stated that it would remain in effect "for a period of not less than 90 days" and thereafter until terminated by defendants in writing giving plaintiff 30 days prior notice. Plaintiff interprets the language "90 days and thereafter" to mean that he had an exclusive listing for at least 90 days plus an additional 30 days if the defendants cancelled the listing within the 90-day period. Defendants, however, argue that their letter dated August 25, 1971, gave plaintiff 30 days prior notice of their intent to cancel the listing agreement as of September 28, 1971.

Ninety days from June 28, 1971, the date the agreement was signed, would actually have been September 26, 1971, which date was prior to the sale of the property. In finding that the agreement was properly terminated after the 90-day period, the trial court relied on *Camp v. Hollis* (1947), 332 Ill. App. 60, 68, 74 N.E.2d 31, wherein this court stated:

> "It is a well recognized rule that where a contract is susceptible of two constructions, 'one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.' 12 Am. Jur. Contracts, sec. 250, p. 792."

Under plaintiff's interpretation of the language, notice could not be given terminating the 90-day agreement until the termination date had been reached. Thus, the exclusive listing would be in force for a minimum term of 120 days, rendering the term "not less than 90 days" meaningless. This interpretation in effect places a limitation on when the 30-day notice could become effective when no such limitation had been expressly stated in the agreement. We agree with the trial court that plaintiff's exclusive listing expired after the 90-day period.

### B.

The question remains as to whether plaintiff is entitled to a commission on a sale consummated after the expiration of the exclusive listing period. This action is based on the brokerage agreement, the

validity of which is not in issue. Section (c) of the agreement entitles plaintiff to a commission on any sale made after the termination of the exclusive listing agreement provided the buyer was one to whom plaintiff "submitted" the property during the time the agreement was in force.

Defendants argue that plaintiff cannot claim credit for "submitting" the property to a buyer ready, willing, and able to purchase the property since Galas told plaintiff he would not have answered the ad if he had known the property was the same property he had seen several months earlier with his own broker; that Galas told plaintiff not to consider him as a prospective buyer produced by plaintiff's efforts; and that defendants questioned the inclusion of Galas's name on the list plaintiff submitted to them. Defendants also argue that plaintiff's efforts had nothing to do with the ultimate sale, and thus plaintiff was not the procuring cause of the sale.

Plaintiff's right to compensation under the agreement according to well established contract principles must be governed by a fair and reasonable interpretation of its provisions. (*Arthur Rubloff & Co. v. Comco Corp.* (1978), 63 Ill. App. 3d 362, 367, 280 N.E.2d 15.) When "a contract is not ambiguous or uncertain, its meaning must be determined from the words or language used, and the court cannot place a construction on the contract which is contrary to or different from the plain and obvious meaning of the language." (*Brown v. Miller* (1977), 45 Ill. App. 3d 970, 972, 360 N.E.2d 585.) Meaning and effect must be given to every part of the contract since it is presumed that each provision was inserted deliberately and for a purpose. (*White v. White* (1978), 62 Ill. App. 3d 375, 378, 378 N.E.2d 1255.) Where the language of a contract is reasonably susceptible to more than one meaning it is ambiguous, and extrinsic evidence must be introduced to explain the language; however, it is not ambiguous simply because the parties do not agree on its meaning. (*White v. White* (1978), 62 Ill. App. 3d 375, 379.) We do not think the instant agreement is ambiguous.

The trial court found only that plaintiff was not the "procuring cause" of the sale. But the agreement entitled plaintiff to a commission if he was the "procuring cause" of the sale *or* if he "submitted" the property to the buyer during the term of the agreement. The agreement did not require plaintiff to be the "procuring cause" *and* have "submitted" the property to the buyer within the specified time. Under the rules of contract construction, we must assume that section (c) was deliberately inserted in the agreement for some purpose. If we find plaintiff "submitted" the property, it is not necessary to also find that he was the "procuring cause."

Therefore, we must decide whether plaintiff's actions constituted a "submission" of the property. The authority cited by both the plaintiff and defendants deals primarily with the issue of whether or not the broker

was the procuring cause of the sale and does not include agreements similar to the one in the instant case.

However, in *Nichols v. Pendley* (Mo. App. 1960), 331 S.W.2d 673, defendants entered into a written contract whereby they employed a broker as their exclusive agent for a period of two weeks to sell their house. The contract provided that if the property was sold to anyone to whom it was "submitted" by the broker within three months from the termination date of the contract, the broker was entitled to a commission. Within the two-week period the broker showed defendants' house to the ultimate purchasers. The sale was not consummated until after the two-week period had expired, but it was within three months after the expiration date.

The owners argued that the broker could not recover since he had not shown himself to be the procuring cause of the sale. In rejecting this argument, the court found that the contract did not make the commission dependent upon "procuring cause" but rather made it dependent upon the fact that the broker had "submitted" the property to the person who bought it. The court reasoned that if it was to be said that the broker had to be the "procuring cause," the word "submitted" would be robbed of a part of its meaning and a clause would have been read into the contract which did not exist.

In determining the meaning of the word "submit," the court set forth the following definitions:

> " 'To leave or commit to the discretion of another.' Webster's New International Dictionary, Second Edition.

> 'To present for determination; to commit to the discretion or judgment of another.' 83 C.J.S., p. 571; Black's Law Dictionary, Fourth Edition; see 40 Words and Phrases, p. 412.

> Roget's International Thesaurus (763.2) treats the words 'submit' and 'offer' as synonymous." 331 S.W.2d 673, 677.

The *Nichols* court construed the word "submit" as not requiring the broker's effort to have been the procuring cause of the sale, or even that his activities should have reached the point of negotiations with respect to such sale, but rather that it was sufficient if the broker had shown the property to the purchaser and had then offered it to him for his consideration and judgment.

In *Kenney v. Clark* (1969), 120 Ga. App. 16, 169 S.E.2d 357, an exclusive listing agreement provided that the broker would be entitled to a commission if the property was sold within three months after the termination of the agency to a purchaser to whom the property was "submitted" by the broker during the agency and whose name was disclosed to the owner in writing by the broker during the agency.

In construing this agreement, the *Kenney* court found that the parties sought to contract specifically against the contingency of the owner selling to a prospect procured by the broker with the knowledge of the owner and to whom the owner sold directly either during or after the termination of the agency. The court found by way of dicta that if such a situation occurred within three months of the termination of the agency, the owner would be liable to the broker for commission.

In the instant case, the record indicates that Galas contacted plaintiff in response to plaintiff's newspaper ad for the property; that plaintiff sent Galas a flyer he had prepared; that plaintiff followed this up with a telephone call to Galas to find out whether he was interested in seeing the property; and that these events took place within the 90-day exclusive listing period. Plaintiff also submitted Galas's name to the defendants as one who had contacted him about the property. No exception was made in the agreement to exclude anyone who might have looked at the property prior to the time of plaintiff's exclusive listing. And there is no evidence in the record that plaintiff knew Galas had looked at the property before, nor that the defendants knew Galas was interested in the property prior to his contacting plaintiff. It seems evident that section (c) was included in the contract to guard against such a situation as is presented here. Under the terms of the contract and the facts in this case, we are of the opinion that plaintiff submitted the property to the buyer within the exclusive period when he sent the information to the buyer at the buyer's request and in effect offered defendants' property for sale. However, this is based only on the evidence presented by the plaintiff since the finding was made at the conclusion of plaintiff's case. In our opinion the trial court should not have directed a verdict in favor of defendants.

In accordance with Supreme Court Rule 366(b)(3)(iii) (Ill. Rev. Stat. 1977, ch. 110A, par. 366(b)(3)(iii)), we reverse and remand this cause with directions to proceed as if the finding had not been made in order to allow the trial court to decide this case on the totality of the evidence presented.

Reversed and remanded with directions.

STAMOS, P. J., and PERLIN, J., concur.