**In re James E. MAXWELL, Jr., Debtor.**

**Charles J. Myler, Jr., Trustee.**

**CHARTHOUSE, INC., Plaintiff,**

v.

**James E. MAXWELL, Jr. and Charles J. Myler, Jr., Defendants.**

Bankruptcy Nos. 82 B 6593, 82 A 3063.

United States Bankruptcy Court, N.D. Illinois, E.D.

June 30, 1983.

Michael Hasson, James Chatz, Lord, Bissell & Brook, Chicago, Ill., for Charthouse.

Charles J. Myler, Ruddy, Myler, Ruddy & Fabian, Aurora, Ill., Trustee.

Charles M. Travis, Travis, Tucker, Pavesich & Assoc., Schaumburg, Ill., for debtor.

## MEMORANDUM AND ORDER

ROBERT L. EISEN, Bankruptcy Judge.

This cause came to be heard on the motion of Charthouse, Inc. regarding Count II of its second amended complaint to have the automatic stay lifted. Charthouse alleges that the franchise agreement and the sublease agreement which the debtor

(Maxwell) was a party to were terminated prior to Maxwell's filing of his Chapter 11 proceeding and therefore the automatic stay should be terminated so Charthouse can regain possession of the business and premises in question. It is Maxwell's position that Charthouse never properly terminated the franchise agreement and sublease and they are valuable assets of the debtor's estate which are assumable under Section 365 of the Bankruptcy Code.

The court having carefully considered all of the pleadings and memoranda filed, the entire record in this case and applicable statutory and case law does hereby find that Charthouse did not properly terminate the franchise agreement and sublease and its motion to lift the automatic stay should be denied.

## FINDINGS OF FACT

In December of 1979 Charthouse entered into a franchise agreement and a sublease with Maxwell whereby Maxwell was given a franchise to operate a Burger King Restaurant in Elgin, Illinois. Pursuant to these agreements Maxwell was obligated to make monthly rental, advertising and royalty payments. At the time Maxwell entered into these agreements, he was already operating a Burger King franchise in Hoffman Estates, Illinois and in August of 1980 Maxwell assumed an additional franchise located in West Chicago, Illinois.

Having built up a substantial debt Maxwell, with the permission of Charthouse, sold the West Chicago and Hoffman Estates franchises in August of 1981. Beginning in January of 1982 Maxwell failed to make the required rental, advertising and royalty payments on the Elgin franchise. On April 6, 1982, a certified letter was sent by Charthouse outlining certain defaults then existing and advising Maxwell that Charthouse would pursue all legal remedies available to it if Maxwell did not cure the default or make satisfactory arrangements for payments within 30 days.

The 30 days passed without Maxwell having cured the defaults or proposing a satisfactory arrangement to make payments.

On May 7, 1982 Charthouse had served on Maxwell a landlord's statutory five day notice informing Maxwell that the sum of $34,491.41 was due in payment of rent on the Elgin Burger King. The notice went on to say that unless payment was made on or before the expiration of five days after service of the notice, said lease would be terminated and Charthouse demanded immediate possession. Maxwell neither vacated the premises nor paid the amounts due Charthouse.

On May 14, 1982 Charthouse filed a complaint of law in the Circuit Court of Kane County against Maxwell for possession of the Elgin store and for a judgment in the amount of the rent arrearage accrued pursuant to the parties' sublease agreement. Maxwell filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 21, 1982.

On August 27, 1982 Charthouse filed its three count complaint against Maxwell to compel assumption or rejection of the executory franchise and sublease agreements, for modification of the automatic stay and to except the debt from discharge. Charthouse did not allege in its original complaint that the franchise and sublease agreements had been terminated prior to the filing of Maxwell's Chapter 11 petition.

On February 14, 1983 at the request of Charthouse, the court directed the U.S. Trustee to appoint a trustee in this case and Charles Myler was thereafter appointed. (The trustee and the debtor, Maxwell, are in accord on the issues here presented. Wherever the words Maxwell or debtor are used in this decision, it is meant also to include the trustee.) On March 7, 1983 Charthouse filed its first amended complaint adding the trustee Charles Myler as a party defendant. Again Charthouse did not allege that the franchise and sublease agreements had been terminated. Instead, Charthouse alleged a right to terminate the agreements due to Maxwell's defaults and acknowledged that said termination was stayed by Section 362(a) of the Bankruptcy Code.

On April 18, 1983 the trustee filed a disclosure statement and plan which called for the assumptions of said agreements and sale to a bona fide purchaser. Thereafter, on April 26, 1983 Charthouse filed its second amended complaint which alleged that the franchise and sublease agreements had been terminated prior to Maxwell filing his Chapter 11 petition and therefore the automatic stay should be terminated in order to allow Charthouse to regain possession of the business and premises.

## ISSUES

1. Whether or not the serving of the 30 day notice and statutory 5 day notice followed by filing a complaint at law served to properly terminate the franchise and sublease agreements between the parties.

2. Whether or not, given the parties conduct prior to the filing of the Chapter 11 petition, there is anything for the trustee to assume under Section 365 of the Bankruptcy Code.

3. Whether or not Charthouse has waived and should be estopped to assert whatever rights it may have had to forfeit Maxwell's interest in the agreements by its conduct both prior and subsequent to the Chapter 11 filing.

4. If the agreements are deemed to be terminated, whether or not the equities of the situation demand that the court in its discretion grant relief to Maxwell from said termination.

## DISCUSSION

The initial question to resolve is whether or not following the terms of the agreements at issue Charthouse properly and finally terminated said agreements prior to Maxwell filing his Chapter 11 petition. The controlling provisions in the franchise agreement are as follows:

DEFAULT—TERMINATION:

A. The parties mutually agree that each and every covenant and agreement herein contained is a condition which is reasonable and necessary for the continuing business relationship of the parties or for the protection of the public in the operation of a food service establishment and that the time and performance of various covenants and agreements is of the essence.

B. Should Franchisee suffer an occurence of any of the following events, Company, at its option and without prejudice to any other rights or remedies provided for hereunder, or by law or equity, may terminate this license...

...(2) If Franchisee defaults in the payment of royalties or advertising due hereunder or fails to submit profit and loss statements or other financial statements or data or reports on gross sales as provided herein and fails to cure said defaults within thirty (30) days of written notification to cure same...

...(6) Upon notification of any default Franchisee agrees to promptly take such steps as may be required to cure the default and shall diligently pursue such curative measures as may be required and in the event that thirty (30) days' time is insufficient then Franchisee shall have as much time as may be reasonably required to cure same...

The controlling provision in the original lease which is incorporated in the parties' sublease is as follows:

LESSOR'S RIGHT OF RE–ENTRY

11. If Lessee shall fail to pay any installments of rent promptly on the day when the same shall become due and payable hereunder, and shall continue in default for a period of thirty (30) days after written notice thereof by Lessor, or if Lessee shall fail to promptly keep and perform any other affirmative covenant of this lease, strictly in accordance with the terms of this lease and shall continue in default for a period of thirty (30) days after written notice thereof by Lessor of default and demand of performance, then and in any event, and as often as any such event shall occur, Lessor may (a) Declare the said term ended, and enter into said premises demised, or any part thereof, either with or without process of law, and expel Lessee or any person occupying the same in or upon said premise,

using such force as may be necessary so to do, and so to repossess and enjoy said premises as in the Lessor's former estate; or (b) Re-let the premises applying said rent from the new tenant on this lease, and Lessee shall be responsible for no more than the rent hereinabove reserved on the day when the same becomes due and payable less the net proceeds of the re-letting. Anything hereinbefore contained to the contrary notwithstanding, if any default shall occur other than in the payment of money, which cannot be reasonably cured prior to the expiration of thirty (30) days from and after the giving of notice as aforesaid, and Lessee commences to eliminate the cause of such default, then Lessor shall not have the right to declare the said term ended by reason of such default.

## THE FRANCHISE AGREEMENT

The franchise agreement clearly indicates that if Maxwell defaults in the payment of royalties or advertising and fails to cure said defaults within 30 days of written notice to cure, Charthouse *at its option may terminate* the license. Charthouse initially claims that when it sent the 30 day notice to Maxwell and he failed to cure, the franchise agreement was terminated. Maxwell argues that under the franchise agreement termination is not automatic but instead Charthouse must declare termination of the agreement by some overt act. Maxwell, as further support for its reading of the termination provision, cites section XI(B)(6) which states that upon notification of any default franchisee shall diligently pursue curative measures and in the event 30 days time is insufficient franchisee shall have as much time as may be reasonably required to cure same.

■ The intent of parties to a contract must be determined from the language of the whole instrument. Effect must be given to each word, clause and term where none should be rejected for lack of meaning or surplusage. *Nice Ball Bearing Co. v. Lescure,* 227 F.2d 118 (7th Cir.1955); *Lathrop v. Bell Federal Savings and Loan*

*Association,* 68 Ill.2d 375, 12 Ill.Dec. 565, 370 N.E.2d 188 (1977). However, where the language of a contract is reasonably susceptible to more than one interpretation, it is ambiguous, and extrinsic evidence must be introduced to explain the language. However, a contract is not ambiguous simply because parties do not agree on its meaning. *Kokinis v. Kotrich,* 74 Ill.App.3d 224, 30 Ill.Dec. 42, 392 N.E.2d 697, affr. 81 Ill.2d 151, 40 Ill.Dec. 812, 407 N.E.2d 43 (1979); *Spircoff v. Spircoff,* 74 Ill.App.3d 119, 29 Ill.Dec. 806, 392 N.E.2d 363 (1979).

The present problem is whether or not, by sending Maxwell a letter advising him of his default and Maxwell not curing within 30 days, Charthouse terminated the franchise agreement. The agreement itself clearly states that Charthouse *may terminate* the license if Maxwell defaults and fails to cure within 30 days after notice. The question is whether or not this means the agreement *is terminated* automatically if cure is not made within 30 days or if some overt act needs to be done in order to declare the agreement terminated.

■ Contracts can be construed by focusing on the words used by the parties and then drawing back and testing their meaning in the context of the entire contract, circumstances surrounding its execution and manner in which parties interpreted it by their performance. *Keep Productions, Inc. v. Arlington Park Towers,* 49 Ill.App.3d 258, 7 Ill.Dec. 648, 364 N.E.2d 939 (1977). The words here state Charthouse *may terminate* the agreement if no cure. The agreement does not say the agreement is automatically terminated. Furthermore, the agreement in section XI(B)(6) calls for the franchisee to be given more than 30 days to cure if need be. Every provision in a contract must, if possible, be given effect, because it is presumed that each was deliberately inserted. *Bankers' Life v. Intern. Telephone & Telegraph,* 239 F.2d 621 (7th Cir.1957); *Continental Television v. Caster,* 42 Ill.App.2d 122, 191 N.E.2d 607 (1963). Where the "may be terminated" language is read in conjunction with section XI(B)(6) of the agreement and past performance of

the parties, it appears clear to the court that the agreement is not to terminate automatically after the 30 day period. Instead, the franchisor may elect to terminate, logically by some overt act, or give the franchisee a longer period to cure, if necessary.

In construing the words of a contract, they must be read naturally. A court may not engage in surmises as to what the parties intended but which they failed to express. *Hanley v. James McHugh Constr. Co.,* 444 F.2d 1006 (7th Cir.1971); *Herlihy Mid-Continent Co. v. Sanitary Dist. of Chicago,* 390 Ill. 160, 60 N.E.2d 882 (1945). Furthermore, an instrument is to be construed most strongly against its author. *Cedar Park Cemetary Assn. v. Village of Calumet Park,* 398 Ill. 324, 75 N.E.2d 874 (1947). The plain language of the contract at issue does not call for automatic termination after 30 days notice of default. Instead, the contract indicates the franchisor *may elect* to terminate after cure is not affected. Although the contract does not specifically spell out what the franchisor must do to terminate said agreement, the language of the document when read naturally and without engaging in surmise indicates that some overt act must be taken by the franchisor after the 30 day notice and failure to cure in order to declare the agreement terminated.

Charthouse, as pointed out previously, sent a 30 day notice of default to Maxwell. However, after the 30 days passed, Charthouse did nothing further to specifically declare the termination of the franchise agreement. Instead, Charthouse sent a landlord's statutory 5 day notice and followed said notice with a complaint for possession of the Elgin store due to Maxwell's default under the sublease. It is Charthouse's alternative position that since the franchise agreement and sublease are dependent upon each other, by sending a landlord's five day notice and following it with a complaint for possession, it in effect, declared the franchise agreement terminated. In other words, the overt act needed to declare the franchise agreement terminat-

ed, in Charthouse's opinion, was that of sending notice and filing suit for possession of the premises under the sublease agreement.

As pointed out previously in construing a contract, its words must be read naturally and a court may not engage in surmise as to what the parties intended but failed to express. Nowhere in either contract at issue is there an indication that a declaration of termination of one will effectively operate as a declaration of the termination of the other. Instead, each agreement has a separate procedure set up for termination and while the franchise agreement does not explicitly outline what type of act is needed to declare the agreement terminated, the court cannot read into it a provision permitting the filing of a five day notice and action for possession on the sublease as termination of the franchise agreement.

Furthermore, after Charthouse sent the 30 day notice of default to Maxwell and then followed with a landlord's statutory five day notice and suit for possession of the premises, the next thing Charthouse did was to file an adversary complaint in this court asking the court to compel assumption or rejection of the agreements in question. Not until April of 1983, one year after Charthouse sent out the 30 day notice did it assert that the franchise agreement and sublease *were* actually terminated previously.

As a result, the equities of the situation would dictate that Charthouse now be estopped from asserting termination of the agreements. Clearly, the debtor and the trustee relied on the fact that Charthouse did not assert the agreements were terminated. The trustee went so far as to find a buyer for the business and devise a Chapter 11 plan to assume the agreements and cure the defaults. This is certainly reliance on Charthouse's inaction to the debtor and trustee's detriment and therefore Charthouse must be estopped from now asserting the agreements were previously terminated.

Finally, the parties seem to agree that the franchise agreement and sublease are dependent upon each other and must be terminated contemporaneously. For the reasons stated above, it is the opinion of the court that the franchise agreement was not properly terminated and therefor it is of no consequence what happened on the sublease. However, taking into account Charthouse's argument that by terminating the sublease it also terminated the franchise agreement a brief examination of the sublease is called for.

## THE SUBLEASE

The termination provision of the underlying lease, which is incorporated by the sublease at issue, provides that if the lessee defaults in the payment of rent and continues in default for 30 days after written notice thereof the lessor may declare said term ended and enter into said premises either with or without process of law and reposses said premises or relet the premises. As outlined above, Charthouse sent the 30 day notice of default and when cure was not made followed it with a landlord's statutory notice and complaint for possession of the premises. No judgment was obtained in the proceedings due to Maxwell's filing of his Chapter 11 proceeding.

Under the bankruptcy code, if the termination of a lease has not yet been completed under state law, a trustee may assume and undertake to cure in the manner provided under Section 365(b) irrespective of the lapse of grace provisions in the lease itself. *Executive Square Office Building v. O'Connor & Associates, Inc.,* 19 B.R. 143 (Bkrtcy.N.D.Fla.1981). However, the right to assume and cure is still dependent on a contract or lease in existence. Therefore, the question to resolve here is whether or not the termination process on the sublease was completed prior to Maxwell filing his Chapter 11 petition.

It is Maxwell's position that the sublease is not terminated until a judgment is entered against the tenant. Furthermore, Maxwell argues that the procedure followed by Charthouse did not conform to the lease provisions as outlined above. Charthouse, in citing Illinois case law, claims that the filing of a forcible entry and detainer action after the five-day notice period expired is an affirmative act by which the landlord terminates the lease.

As pointed out previously, the sublease and franchise agreement are dependent upon each other and since the franchise agreement was not terminated properly, a termination of the sublease, even if properly done, is of no consequence. Therefore, it is not necessary to discuss in detail whether or not there was a final termination of the sublease prior to the Chapter 11 filing. However, further brief reference is made to *Executive Square Office Building v. O'Conner & Associates,* supra. The court therein reasoned that if the extinguishment of a lease interest is still subject to an existing and available statutory grace proviso or right to resort to equity to prevent a forfeiture or termination, then there has not as yet been an ultimate or final termination for the purpose of analyzing whether the provisions of Section 365 of the Bankruptcy Code are applicable.

The facts surrounding the claimed terminations of the agreements in question have been referred to previously. Given Charthouse's delay in asserting termination of the provisions in question, the representations Charthouse made regarding working out Maxwell's problems before and after its notice was sent, the actual way Charthouse went about attempting to terminate the two agreements and the fact that these agreements are the debtor's only assets, this court concludes that the sublease was not finally and irrevocably terminated prior to the filing of the Chapter 11 petition and the trustee may assume and undertake to cure the agreements in the manner provided under Section 365(b) of the Bankruptcy Code.

## CONCLUSIONS OF LAW

For there to be a right to assume an executory contract and effect a cure under section 365 of the Bankruptcy Code there must still be a contract or lease in exist-

ence. In order to determine whether said contract is still in existence the termination provisions of the contract must be examined in light of the actual procedures followed by the party seeking termination of the contract.

Contracts are construed by first focusing on the words used by the parties and then testing their meaning in the context of the entire contract, the circumstances surrounding its execution and the manner in which parties interpreted it by their performance and conduct. *Keep Productions, Inc., supra.* In construing the words of a contract they must be read naturally. A court may not engage in surmise as to what the parties may have intended but failed to express. *Hanley;* supra, *Herlihy Mid-Continent Co.,* supra. Furthermore, an instrument is to be construed most strongly against its author. *Cedar Park Cemetary Assn., supra.*

Taking all of this into account, the court finds that a franchise agreement which states that a franchisor may terminate said agreement if cure is not made 30 days after notice of default is not an agreement which terminates automatically 30 days after notice of default. Furthermore, the filing of a landlord's statutory five day notice and action for possession of the premises under a separate sublease does not operate to terminate the franchise agreement.

Additionally, the sending of a 30 day notice followed by a landlord's statutory five day notice and action for possession does not operate to terminate a sublease where a judgment has not been rendered on the suit for possession, the termination of said sublease is not asserted for at least one year after it allegedly was terminated and the agreement is the debtor's only asset.

WHEREFORE, IT IS HEREBY FOUND AND ORDERED that Charthouse did not properly terminate the franchise agreement and sublease in question and its motion to lift the automatic stay is denied.